# EXHIBIT B

Steven A. Morelli (SM-4721)
Joshua Beldner (JB-2182)
The Law Office of Steven A. Morelli, P.C.
1461 Franklin Avenue
Garden City, NY 11530
(516) 393-9151

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
PATSY JOINNIDES,

                        Plaintiff

        -against-

FLORAL PARK-BELLEROSE UNION FREE
SCHOOL DISTRICT, BOARD OF EDUCATION OF
THE FLORAL PARK-BELLROSE UNION FREE
SCHOOL DISTRICT,

                Defendants.
-----------------------------------------------------------------X

           **AMENDED**
           **COMPLAINT**

       ***Jury Trial Demanded***

      Plaintiff PATSY JOINNIDES, by and through her attorneys, THE LAW OFFICE

OF STEVEN A. MORELLI, P.C., respectfully alleges, upon knowledge as to herself and

her own actions, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Patsy Joinnides has lived in the Floral Park community for almost 25

     years. She has always been an active and vocal member of the community holding

     dear to her the best interests of young children who attended Floral Park-Bellerose

     District. Indeed, Plaintiff's own children attended school in the District, and it

was her dream and passion to work with young students and contribute to the tight-knit community within which she resides.

2.  From 1996 to 2008, Ms. Joinnides worked at John Lewis Childs elementary school, which is one of two elementary schools in the District. Specifically, from 1996 – 2002, Plaintiff worked as a Title I Reading Specialist, and from 2002 to 2008, she worked as a Special Education Assistant. In addition to her regular duties, Plaintiff participated in many extra-curricular activities and programs for the benefit of students in the District. Ms. Joinnides proved herself as hard-working and passionate educator, and over the course of her employment received "outstanding" marks on all of her performance evaluations.

3.  During the 2009-2010 school year, after receiving a Master's Degree in Childhood Education, Plaintiff worked as a permanent substitute at John Lewis. From January 2010 to May 2010, Ms. Joinnides worked as a full-time leave replacement for two teachers while they were on maternity leave. In or around June 2010, one of the teachers Plaintiff filled in for announced that she would not be returning for the 2010-2011 school year. In recognition of her credentials, experience, and performance record, Ms. Joinnides was encouraged to apply for the full-year leave replacement position by teachers and administrators at John Lewis. Plaintiff did apply for the position, but was rejected in favor of an individual who was more than 30 years younger than her, and who had inferior

2

qualifications and experience. At the time of her application, Ms. Joinnides was 57-years-old.

4.     In the Fall of 2010, the District's Board of Education urged taxpayers in the community to pass a $5,000,000 bond referendum, which would be used to fund capital improvements to the District's boilers, lighting system, and windows. Both Plaintiff and her husband were vocal in their opposition to the bond proposal, and spoke out at a November 8, 2010 Board meeting. Specifically, Plaintiff and her husband, who is an engineer with extensive experience in the energy field, believed that the capital improvements could be funded through the use of Energy Service Companies ("ESCOs"), wherein the taxpayers of the community would not have to bear any of the cost. Plaintiff wrote an open letter to *The Floral Park Dispatch*, a community newspaper urging voters to reject the bond proposal. The Board's bond proposal was voted down, much to the dismay of the Board, and then-Superintendent Lynn Pombonyo.

5.     Weeks later, the Board of Education wrote a letter to *The Floral Park Dispatch* falsely accusing Plaintiff's husband of lobbying against the bond proposal because of some unspecified financial interest. In fact, the only interest that motivated Mrs. Joinnides and her husband was the prudent and efficient use of taxpayer money. Immediately following Plaintiff's vocal opposition to the bond proposal, she was taken off the District's substitute list, without any explanation or justification whatsoever.

3

6.     Plaintiff was diagnosed with bladder cancer in 2011. In or around October 2011, while she was in the process of undergoing chemotherapy, Plaintiff began serving as a member of the Citizens Budget Advisory Committee ("CBAC"); a committee made up of community residents tasked to assist the District in constructing the budget for the upcoming school year. During her time on the CBAC, Plaintiff expressed strong opinions regarding the District and the Board of Education, and openly criticized policies that she felt were not in the best interests of community residents, including the consistent overestimation of budget expenditures, and the mismanagement of financial resources. Plaintiff served on the CBAC until June 2012.

7.     After a long and difficult recovery, Ms. Joinnides finally felt healthy enough to teach again in the Fall of 2012. Dr. Pombonyo had retired in the Spring of 2012, so Plaintiff re-applied to the District's substitute list. After following the necessary protocols of obtaining the permission and recommendation of the building principal of John Lewis, Ms. Joinnides was temporarily re-hired as a substitute, and worked on four occasions from September 19, 2012 to October 4, 2012.

8.     Plaintiff was elated to be back working with students in her community, pursuing her passion, especially given her bout with a life-threatening illness. On October 16, 2012, however, Ms. Joinnides short-lived happiness was eviscerated, when

4

she was informed that the Board would not approve her re-appointment to the District's substitute list. According to current Superintendent James Opiekun, the Board had a "long institutional memory," and was afraid that Plaintiff would "blur the line between homeowner/taxpayer and employee." As a result, Plaintiff has been barred from working in the District.

9.      As more fully set forth below, in removing Plaintiff from the substitute list in 2010 and again denying her employment in 2012, Defendants retaliated against Plaintiff for speaking out as a community member and taxpayer on matters of public concern, in violation of her constitutional right to freedom of speech under the First Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983, and Article I, § 8 of the New York State Constitution. Further, in denying Plaintiff the one-year leave replacement position in 2010, Defendants discriminated against Ms. Joinnides on the basis of her age, in violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

11.     Venue is proper in this case pursuant to 28 U.S.C. § 1391 because (1) the Defendants are located in Nassau County, NY, which is located in the Eastern District of New York, and (2) the events which give rise to Ms. Joinnides's claims

took place in Nassau County, New York, which is located in the Eastern District of New York.

## **PARTIES**

12.    Plaintiff PATSY JOINNIDES is a 59-year-old female individual, who is a resident and domiciliary of Nassau County, NY. As set forth below, during the relevant time periods, Plaintiff was an "employee" of Defendant Floral Park-Bellerose Union Free School District.

13.    Defendant FLORAL PARK-BELLEROSE UNION FREE SCHOOL DISTRICT ("the District"), at all times hereinafter mentioned, was and still is a municipal corporation incorporated under and by virtue of the laws of the State of New York, with its principal place of business located at 1 Poppy Place, Floral Park, NY, 11001. As set forth below, during the relevant time periods, the District was Plaintiff's "employer."

14.    Defendant BOARD OF EDUCATION OF THE FLORAL PARK-BELLEROSE UNION FREE SCHOOL DISTRICT ("the Board"), at all times hereinafter mentioned, was and still is a municipal corporation incorporated under and by virtue of the laws of the State of New York, with its principal place of business located at 1 Poppy Place, Floral Park, NY 11001.

## FACTUAL ALLEGATIONS

### *Background*

15.   Plaintiff Patsy Joinnides has been a resident of Floral Park since 1988. Her two children both attended, and graduated from the District.

16.   At all times during her residency in Floral Park, Plaintiff has been actively involved in the community, and in the District.

17.   In or around 1992, Ms. Joinnides served on the Executive Board of the District's Parent Teacher Association, and served as Corresponding Secretary. Ms. Joinnides also co-chaired the District's Parents as Reading Partners ("PARP") program, and volunteered at the Floral Park Bellerose School's library.

18.   In or around 1993, Plaintiff was employed by the District to help implement the conversion of the library's card catalog system to a computerized system. Upon information and belief, the conversion was completed in or around 1994.

19.   In October 1996, Ms. Joinnides was hired by the Defendant District as a Title I Reading Assistant, for grades 1-6, at John Lewis Childs School ("John Lewis"), which is one of the elementary schools in the District. Plaintiff participated in this supplemental reading program for students who were not performing at their grade level, and provided instruction to improve their skills.

20.     Plaintiff maintained her position as Title I Reading Assistant from October 1996 to May 2002. During this period, however, Ms. Joinnides also performed additional duties, and participated in additional programs at the request of District officials.

21.     For example, from June 1998 to June 1999, at the behest of then Superintendent William McDonald, Ms. Joinnides became Lightspan Coordinator for Grade 4 at John Lewis. As part of this program, Plaintiff utilized Sony Playstation to provide additional instruction to students.

22.     In 1999, at the request of John Michon, the District's Head of the Title I Reading program, Plaintiff participated in the District's Saturday Cultural Arts Program, Grades 3-6.

23.     In September 2002, Ms. Joinnides received her New York State Certification as Special Education Assistant, and from September 2002 to June 2008, Plaintiff worked continuously for the District as Special Education Assistant at John Lewis.

24.     In addition to her duties as Special Education Assistant, Ms. Joinnides continued her practice of participating in extra-curricular activities for the benefit of the District. Specifically, Plaintiff worked as an After School Homework Coordinator, and as a Socialization Skills Coordinator at John Lewis.

25.   Over the course of her employment at the District, Ms. Joinnides received exclusively positive performance evaluations. In fact, Plaintiff never received a mark below "outstanding" on any evaluation.

26.   Further, Plaintiff was praised by parents, colleagues, and staff for her work ethic, dependability, and passion for teaching. In short, her reputation at the District was stellar.

27.   In or around 2007, Plaintiff began attending Adelphi University for the purposes of obtaining a Master's Degree. As part of her Masters program at Adelphi, Plaintiff was required to student teach. Because Adelphi would not allow Ms. Joinnides to fulfill her student teaching requirements at John Lewis, Plaintiff temporarily left the District in June 2008.

28.   From August 2008 to December 2008, Ms. Joinnides student-taught at P.S. 203 Oakland Gardens Elementary School, in Bayside, NY.

29.   In January 2009, Ms. Joinnides graduated from Adelphi University with a 4.0 Grade Point Average, and received a Master's degree in Childhood Education.

30.   In February 2009, Plaintiff received a New York State Certification as a Childhood Education Teacher.

31.     From September 2009 to December 2009, Plaintiff was re-hired by the District, and worked as a Permanent Substitute Teacher at John Lewis.

32.     In January 2010, Ms. Erin Notaro, a first grade teacher at John Lewis, went out on maternity leave. Ms. Joinnides took over for Ms. Notaro, and worked as a full-time leave replacement for her class until March 2010.

33.     In April 2010, Ms. Laura Zilinek, a fifth grade teacher at John Lewis, went out on maternity leave. Ms. Joinnides took over for Ms. Zilinek, and worked as a full-time leave replacement for her class until May 2010.

### *Age Discrimination*

34.     In or around early June 2010, Ms. Notaro announced that she would not be returning for the 2010-2011 school year. As a result, there was a vacancy for a full-time teacher at the first grade level at John Lewis.

35.     Plaintiff was encouraged to apply for the position by building principal Pamela Fine, and Dr. Margaret McGlynn, who was the Assistant Principal of John Lewis at the time. Ms. Joinnides applied for the one-year leave replacement position, and was interviewed that summer. The interview was conducted by Ms. Fine, Dr. McGlynn, Assistant Superintendent for Curriculum and Instruction Caroline Schozer, and Special Education Teacher Bridgett Stegmeier.

36.    According to several of the individuals who made up the interview committee, Ms. Joinnides performed exceptionally well during the interview. Plaintiff was informed, however, that despite her excellent credentials, 17 plus years of outstanding service at the District, and sterling reputation, she was not going to be awarded the position. Rather, the position was given to a female individual named Jessica Anzalone, who was in her early 20s at the time. At the time she applied, Ms. Joinnides was 57-years-old.

37.    Unlike Ms. Joinnides, at the time of her hiring, Ms. Anzalone did not have a Master's degree.

38.    Following her appointment, Ms. Anzalone's position was converted from a temporary leave replacement position to a permanent tenure track position. Ms. Anzalone is still presently teaching first grade at John Lewis.

39.    Despite being passed over for someone with inferior qualifications, Ms. Joinnides wanted to continue to serve and work for her community. As a result, she worked regularly worked as a substitute in the District in September 2010 and October 2010.

*Plaintiff Speaks Out as Member of Community*

40.     In the Fall of 2010, the District and the Board of Education proposed a referendum that allowed citizens and taxpayers of the Floral Park community to vote on the funding for capital improvements that were deemed necessary within the District. The majority of the capital improvements proposed were energy-related projects, such as replacing the District's boilers, windows, and lighting systems.

41.     The referendum was to be held on November 16, 2010. The Board was in favor of funding the capital improvements through the issuance of a $5,000,000 bond. If such a proposal was adopted by the community, the taxpayers would be required to pay for the cost of the capital improvements.

42.     On November 8, 2010, Plaintiff and her husband, Jim Joinnides attended a Board meeting wherein the bond proposal was discussed. At the meeting, Mr. Joinnides expressed his concern, as a community taxpayer, regarding the bond proposal. Specifically, he suggested that the District explore the possibility of utilizing an Energy Savings Company ("ESCO") for purposes of the addressing the District's capital improvement needs through Energy Performance Contracts ("EPCs").

43.     Mr. Joinnides had, in the past, worked for an ESCO as an engineer, identifying and quantifying potential savings for school districts, and volunteered his services to the District in obtaining potential bidders for such a project. At the time he

spoke out, Mr. Joinnides was not working for an ESCO, and had no interest in the matter other than the prudent and efficient use of taxpayer dollars.

44.    Plaintiff also spoke at the meeting, and presented news excerpts to the Board and to the audience, wherein it was demonstrated that many other school districts on Long Island had utilized ESCOs, and had realized tremendous cost savings to the taxpayers in those communities. As a taxpayer in the community, Ms. Joinnides was concerned that the bond proposal would unnecessarily pass costs along to the taxpayers, wherein there were cost-neutral alternatives that were rejected by the Board.

45.    Plaintiff also told the members of the public at the meeting that Mr. Peter Novak of the New York State Comptroller's Office would welcome questions and phone calls from the community regarding the financial operations of the District. Mr. Novak had given Ms. Joinnides permission to give out his phone number to concerned residents.

46.    After she made this statement, Superintendent Lynn Pombonyo became visibly angered, and yelled that she too had Mr. Novak's phone number, and yelled that she too would be speaking with Mr. Novak. Ms. Pombonyo never called Mr. Novak following the Board meeting.

47.     On November 12, 2010, Plaintiff wrote an open letter to the *Floral Park Dispatch,* a community newspaper. In the letter, which was published, Ms. Joinnides re-iterated her concerns regarding the bond proposal, and urged Floral Park residents to vote down the bond referendum.

48.     In her letter, Plaintiff stated "Our school board acts upon the assumption that we, the taxpayers, the ones they are accountable to, will continue to do their bidding, unquestioned. Speaking of questions, a resident's question about the reasons why the district did not entertain the possibility of entering into an EPC was never answered . . . It is my opinion that question could not be answered because the option was never explored. I urge you to vote down this bond referendum and demand that the board go back to the drawing board and do their homework, shame on them."

49.     On November 16, 2010, the bond referendum was voted down by the Floral Park community.

50.     On December 10, 2010, the Board of Education wrote a letter to the *Floral Park Dispatch*, which was published. The letter suggests that Mr. Joinnides, in opposing the bond proposal as a taxpayer, was somehow motivated by financial gain. Specifically, the Board wrote, "One can only wonder what motivates Mr. Joinnides. He claims it is interest and concern yet he actively lobbied against the bond issue while proclaiming that the capital improvements were necessary."

51.  The Board levied false accusations about Mr. Joinnides in a clear attempt to discredit his efforts as a taxpayer, and his credentials as an energy expert.

52.  Mr. Joinnides responded to the Board's letter in a subsequent issue of the *Floral Park Dispatch*, truthfully stating that "if you go through an ESCO, the savings are earmarked solely for the capital improvements. Total transparency. Total accountability." In contrast, Mr. Joinnides wrote that cost savings via bond proposal "could get lost in the overall budget, and be used for anything the Board of Education or Administration chooses."

53.  Mr. Joinnides also wrote, "the suggestion that I personally have something to gain by the district using an ESCO borders on being slanderous. The only thing I have to gain is the same thing every other taxpayer in the Floral Park-Bellerose District has to gain: the intelligent, prudent use of our money."

54.  Following the November 8, 2010, Board meeting, Plaintiff's name was removed from the District's substitute list. As a result, Plaintiff was effectively prevented from working at the District. Upon information and belief, Superintendent Pombonyo directed that Plaintiff's name be removed permanently.

*Ms. Joinnides is Diagnosed with Cancer*

55.     On August 10, 2011, Plaintiff began bleeding from her bladder. Subsequently, she

was diagnosed with stage 2/3 muscle invasive bladder cancer.

56.     After eight rounds of chemotherapy from September 2011 to December 2011, Ms.

Joinnides underwent a seven hour surgery to remove her bladder. The surgery was

successful, and Plaintiff endured a long, albeit successful recovery back to health.

57.     In June 2012, Ms. Joinnides founded a 501(c)(3) public charity known as

"inTouch, Inc." The charity was created by Plaintiff as a way to help cancer

patients stay in touch with family and loved ones while being hospitalized.

58.     The goal of the non-profit organization is to raise monies through donations to

provide patients with iPads and other electronic communication devices.

*Plaintiff Serves on Citizens Budget Advisory Committee*

59.     In or around October 2011, while she was in the process of undergoing

chemotherapy, Plaintiff began serving as a member of the Citizens Budget

Advisory Committee ("CBAC"); a committee made up of community residents

tasked to assist the District in formulating the budget. Board members and District

Administrators, including Superintendent Pombonyo and Assistant

Superintendent Michael Fabiano, attended CBAC meetings.

16

60.     During her time on the CBAC, Plaintiff expressed strong opinions regarding the District and the Board of Education, and openly criticized policies that she felt were not in the best interests of community residents, including the consistent overestimation of budget expenditures, and the mismanagement of financial resources. Plaintiff also expressed strong opinions that the District's Administration was "top heavy," and that the cost of the Administration's salaries was too high.

61.     Additionally, Plaintiff strongly advocated against fiscal cuts to academic programs in the District, when there were other viable options for savings. Several of Plaintiff's positions regarding the budget were unpopular with the Board, and the District's Administration. Although Plaintiff was critical of the District, and disagreed with many of the Board's proposals, she did not act rudely or disrespectfully towards any individuals while at CBAC meetings.

62.     Plaintiff served on the CBAC until June 2012.

### *Further Retaliation*

63.     In the Spring of 2012, Dr. Pombonyo announced her retirement from the District. She was replaced by Mr. James Opiekun in or around July 2012.

64.     At around that time, Ms. Joinnides's health was improving and she wanted to try substitute teaching again, as teaching is her passion and she loved working with children in her community at John Lewis.

65.     In early September 2012, Plaintiff contacted Mr. Opiekun's secretary and asked about substitute positions. The secretary informed Ms. Joinnides that because she had been taken off of the substitute list, she would need to re-apply and that the new Superintendent's policy was to have applicants go through the building principal.

66.     At the time, Dr. Margaret McGlynn was the Principal of John Lewis. Plaintiff contacted Dr. McGlynn, and Dr. McGlynn gathered three letters of recommendation for Ms. Joinnides. Dr. McGlynn forwarded her recommendation, along with the three other recommendations she had obtained for Plaintiff, to Mr. Opiekun's office.

67.     Plaintiff was called by Mr. Opiekun's secretary and was told that she could begin substitute teaching on September 19, 2012. From September 19 to October 4, Plaintiff was called to substitute on four occasions.

68.     Returning to work with young students at John Lewis brought Ms. Joinnides incredible pride and joy, especially following her health complications.

69.     On October 15, 2012, Ms. Joinnides went to the District Administrative Offices to pick up her pay check for the days she had worked. While at the office, Mr. Opiekun's secretary informed her that the Superintendent wanted to meet with her.

70.     On October 16, 2012, Plaintiff met with Superintendent Opiekun. Mr. Opiekun told Ms. Joinnides that she could no longer work for the District as a substitute teacher. Mr. Opiekun stated that the Board of Education "had a long institutional memory," and that the Board was "afraid that you will blur the lines between homeowner/taxpayer and an employee." Mr. Opiekun further stated that employees of the District "need to be good will ambassadors for the District."

71.     At the end of the meeting, Mr. Opiekun told Plaintiff he had heard nothing but praise regarding her work from Dr. McGlynn and other District Administrators, and that he would go back to the Board to seek approval.

72.     On October 18, 2012, Plaintiff learned that Dr. McGlynn had been interviewing potential substitute teachers, because there was a shortage of available substitutes in the District.

73.     On October 25, 2012, Mr. Opiekun e-mailed Plaintiff and informed her that she would not be added to the substitute teacher list, and that she could therefore not work in the District. Ms. Joinnides was, understandably, devastated.

19

## CLAIMS FOR RELIEF

74. Based on the foregoing, in removing Plaintiff from the substitute list in 2010, and denying her employment in October 2012, Defendants retaliated against Plaintiff for speaking out as a community member and taxpayer on matters of public concern, in violation of her constitutional right to freedom of speech under the First Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983, and Article I, § 8 of the New York State Constitution.

75. Based on the foregoing, in denying Plaintiff the one-year leave replacement position in 2010, Defendants discriminated against Ms. Joinnides on the basis of her age, in violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983. Defendants are liable for the deprivation of Plaintiff's rights because such acts were taken in accordance with the Defendant's custom or practice of discriminating and/or selectively treating individuals; these practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers; and, the individual policymakers directly participated in and/or tacitly condoned the discrimination/retaliation to which Plaintiff was subjected.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants for all compensatory, emotional, psychological and punitive damages, lost compensation, front pay, back pay, injunctive relief, liquidated damages, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that the

Court grant the Plaintiff any other relief to which she is entitled, including but not limited to:

1.   Awarding reasonable attorneys fees and costs and disbursements of this action;

2.   Granting such other and further relief that to the Court seems just and proper.

Dated: Garden City, New York
      April 22, 2014

THE LAW OFFICE OF
STEVEN A. MORELLI, P.C.
*Attorneys for Plaintiff*
1461 Franklin Avenue
Garden City, New York 11530
(516) 393-9151

_____
Joshua Beldner