UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
PATSY JOINNIDES,

                          Plaintiff,                          **12-CV-5682 (JS) (AKT)**

             -against-


FLORAL PARK-BELLEROSE UNION FREE
SCHOOL DISTRICT, BOARD OF EDUCATION OF
THE FLORAL PARK-BELLROSE UNION FREE
SCHOOL DISTRICT,

                          Defendants.

--------------------------------------------------------------------X


PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT


Respectfully Submitted,

Joshua Beldner
**TILTON BELDNER LLP**
626 RXR Plaza
Uniondale, NY 11556
P: (516) 262-3602
F: (516) 324-3170

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................i

PRELIMINARY STATEMENT.....................................................................1

STATEMENT OF FACTS ............................................................................2

ARGUMENT ...............................................................................................2


POINT I
DEFENDANTS RETALIATED AGAINST PLAINTIFF IN 2010 AND
2011 BECAUSE OF HER OPPOSITION TO THE BOARD'S PROPOSED
BOND, IN VIOLATION OF THE FIRST AMENDMENT.................................3

A.  Background........................................................................................3

B.  Plaintiff Engages in Protected Speech...............................................4

C.  Plaintiff Suffered an Adverse Employment Action .........................5

D.  Causal Connection Between Plaintiff's Speech and Adverse Action..............7

E.  Plaintiff Has Established Municipal Liability for Purposes of § 1983.............8


POINT II
DEFENDANTS RETALIATED AGAINST PLAINTIFF IN OCTOBER
2012 BECAUSE OF HER OPPOSITION TO THE BOND, AND
BECAUSE OF HER SPEECH AS MEMBER OF THE CBAC,
IN VIOLATION OF THE FIRST AMENDMENT ...........................................11

A.  Plaintiff Has Established a Prima Facie Case of Retaliation Based on
    Her Opposition to the Bond..........................................................13

B.  Plaintiff Has Established a Prima Facie Case of Retaliation Based on
    Her CBAC Activity.......................................................................13

        1.  Plaintiff's Speech Touched Upon Matters of Public Concern.............11

        2.  Plaintiff Was Speaking Out as a "Citizen," and Not an "Employee" ..16

C.  Defendants' Reason For Refusing to Hire Plaintiff is Pretextual ................... 17

1.  Defendants' Justification is False ....................................................... 18

2.  The Evidence in the Record Clearly Establishes Retaliatory Intent .... 22

CONCLUSION ............................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ..................................................................................... 2

Augustin v. Enlarged City School Dist. of Newburgh,
    616 F.Supp.2d 422 (S.D.N.Y. 2009) ............................................................ 8

Bieluch v. Sullivan,
    999 F.2d 666 (2d Cir. 1993) ......................................................................... 14

Bucalo v. Shelter Island Union Free School Dist.,
    2012 WL 3240832 (2d Cir. 2012) ................................................................ 11

Brown v. Baldwin Union Free School Dist.,
    603 F.Supp.2d 509 (E.D.N.Y. 2009) ........................................................... 11

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ..................................................................................... 2

Cioffi v. Averill Park Cent. School Dist. Bd. of Educ.,
    444 F.3d 158 (2d Cir. 2006) ......................................................................... 16

Cronin v. Aetna Life Ins. Co.,
    46 F.3d 196 (2d Cir. 1995) ........................................................................... 17

Cunningham v. New York State Dep't of Labor,
    429 Fed. Appx. 17 (2d Cir. 2011) ................................................................ 3

Curcio v. Roosevelt Union Free School Dist.,
    2012 WL 3646935 (E.D.N.Y. 2012) ........................................................... 11

Gagliardi v. Village of Pawling,
    18 F.3d 188 (2d Cir. 1994) ........................................................................... 24

Gallo v. Prudential Residential Serv.,
    22 F.3d 1219 (2d Cir. 1994) ......................................................................... 2

Garcetti v. Ceballos,
    547 U.S. 410 (2006) ..................................................................................... 16

Giacopelli v. Incorporated Village of Malverne,
    2011 WL 6287852 (E.D.N.Y. 2011) ........................................................... 8

Gilford v. City of New York,
    2004 WL 1574695 (S.D.N.Y. 2004) ........................................................... 7

Graham v. Henderson,
    89 F.3d 75 (2d Cir. 1996)..................................................................................... 2

Gregory v. Daly,
    243 F.3d 687 (2d Cir. 2001)................................................................................ 24

Holtz v. Rockefeller & Co., Inc.,
    258 F.3d 62 (2d Cir. 2001).................................................................................. 25

Housing Works, Inc. v. City of New York,
    72 F.Supp.2d 402 (S.D.N.Y. 1999)...................................................................... 12

Hueston v. City of New York,
    2005 WL 53256 (S.D.N.Y. 2005)......................................................................... 16

Hurdle v. Board of Educ for City of New York,
    2003 WL 22080721 (S.D.N.Y. 2003)..................................................................... 9

Isenalumhe v. McDuffie,
    697 F.Supp.2d 367 (E.D.N.Y. 2010) ................................................................... 16

Jaroslawicz v. Seedman,
    528 F.2d 727 (2d Cir. 1975)................................................................................... 2

Jeffreys v. City of New York,
    426 F.3d 549 (2d Cir. 2005)................................................................................... 2

Knight v. U.S. Fire Ins. Co.,
    804 F.2d 9 (2d Cir. 1986)..................................................................................... 25

Konits v. Valley Stream Cent. High School,
    394 F.3d 121 (2d Cir. 2005)................................................................................... 3

Konits v. Valley Stream Cent. High School Dist.,
    2006 WL 224188 (E.D.N.Y. 2006)...................................................................... 10

Koubek v. County of Nassau,
    2012 WL 1107734 (E.D.N.Y. 2012) .................................................................... 17

Lamberg v. McCann Erickson,
    543 F.Supp.2d 265 (S.D.N.Y. 2008).................................................................... 22

Mandell v. County of Suffolk,
    316 F.3d 368 (2d Cir. 2003)................................................................................ 13

McCarthy v. Dun & Bradstreet Corp.,
       484 F.3d 184 (2d Cir. 2007)..................................................................................... 2

McKenzie v. Nicholson,
       2009 WL 179253 (E.D.N.Y. 2009)......................................................................... 11

Morris v. Lindau,
       196 F.3d 102 (2d Cir. 1999).................................................................................... 14

Nagle v. Marron,
       663 F.3d 100 (2d Cir. 2011)...................................................................................... 9

Patterson v. County of Oneida,
       375 F.3d 206 (2d Cir. 2004)...................................................................................... 8

Peele v. New York City Dept. of Social Services,
       1994 WL 389160 (S.D.N.Y. 1994).......................................................................... 24

Reeves v. Sanderson Plumbing Prods.,
       530 U.S. 133 (2000) ................................................................................................ 22

Rodriguez v. Clinton,
       2009 WL 261203 (N.D.N.Y.  Feb. 4, 2009)........................................................... 11

Rosendale v. Mahoney,
       2008 WL 2061266 (S.D.N.Y. 2008).......................................................................... 7

Ross v. Breslin,
       693 F.3d 300 (2d Cir. 2012).................................................................................... 17

Ramos v. Marriot Intern., Inc.,
       134 F.Supp.2d 328 (S.D.N.Y. 2001)....................................................................... 22

Rule v. Brine, Inc.,
       85 F.3d 1002 (2d Cir. 1996)...................................................................................... 2

Santora v. All About You Home Care, LLC.,
       2012 WL 1964965 (D. Conn. 2012) .......................................................................... 7

Shain v. Center for Jewish History, Inc.,
       418 F.Supp.2d 360 (S.D.N.Y. 2005)....................................................................... 25

Shub v. Westchester Co. College,
       556 F.Supp.2d 227 (S.D.N.Y. 2008)................................................................. 17, 24

Sousa v. Roque,
    578 F.3d 164 (2d Cir. 2009) .................................................................................................... 15

Tekula v. Bayport-Blue Point School Dist.,
    295 F.Supp.2d 224 (E.D.N.Y. 2003) ........................................................................................ 9

Thomas v. iStar Fin., Inc.,
    508 F.Supp.2d 252 (S.D.N.Y. 2007) .............................................................................. 11, 13

Valenti v. Torrington Bd. of Educ.,
    601 F.Supp.2d 427 (D. Conn. 2009) ......................................................................................... 9

Williams v. Regus Management Group LLC,
    836 F.Supp.2d 159 (S.D.N.Y. 2011) ..................................................................................... 22

Yu v. New York City Housing Development Corp.,
    2011 WL 2326892 (S.D.N.Y. 2011) ....................................................................................... 25

## **PRELIMINARY STATEMENT**

Plaintiff Patsy Joinnides has lived in the Floral Park community for more than 25 years. She has always been an active and vocal member of the community, holding dear to her the best interests of the children who attend the Floral Park-Bellerose School District ("the District"). In addition to being an active member of the community, Plaintiff also worked at the District for more than 14 years. Plaintiff's performance record as an employee of the District is indisputably flawless.

In November 2010, while she was working as a per diem substitute for the District, Plaintiff exercised her First Amendment right to free speech, by expressing opposition to a $5 million bond that the Board of Education was proposing to the community's taxpayers. Immediately after Ms. Joinnides engaged in this protected activity, Defendants took action against her, by removing her from the substitute roster and not calling her to teach for the remainder of the 2010-11 school year. In so doing, Defendants retaliated against Plaintiff for exercising her right to free speech, in violation of the First Amendment.

From October 2011 to June 2012, Plaintiff again exercised her right to free speech when she served on the Citizens Budget Advisory Committee ("CBAC"). As a member of the CBAC, Ms. Joinnides was critical of the Board, and expressed opposition to certain budgetary proposals which she believed were not in the best interest of the community's taxpayers. In October 2012, the District again took action against Plaintiff, by refusing to allow her to work in the District as a substitute teacher. The evidence in the record clearly shows that in denying her employment in October 2012, Defendants were retaliating against Plaintiff because of her opposition to the bond in 2010, and because of the criticism of the Board that she levied as a member of the CBAC. In addition, the evidence demonstrates that the reasons provided by Defendants for the adverse actions they took against Plaintiff constitute pretext, as the justifications asserted are plainly contradicted by the facts contained in the record, belied by the evidence, and contrary to common sense.

For the reasons set forth below, Defendants' motion for summary judgment must be denied.[1]

---

[1] Plaintiff has chosen not to proceed with her age discrimination claim, brought pursuant to the Equal Protection Clause.

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to Plaintiff's Counterstatement Pursuant to Local Rule 56.1, the Defendant's Statement Pursuant to Local Rule 56.1 where not disputed, and the Declaration of Joshua Beldner and the exhibits annexed thereto for a full recitation of the facts relevant to the determination of this motion.

## ARGUMENT

The Second Circuit has long held that the granting of a motion for summary judgment is a drastic remedy which must be used "sparingly." Gallo v. Prudential Residential Serv., 22 F.3d 1219 (2d Cir. 1994). The burden is on the moving party to establish the absence of any material factual issues. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In making this determination, the court "must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment, and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 484 F.3d 184 (2d Cir. 2007); Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) ("evidence of the party opposing summary judgment is to be believed and all justifiable inferences are to be drawn in that party's favor.") A fact is "material" if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In reviewing such a motion, "the judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). If there are any doubts as to the existence of a triable issue of fact or if a material issue of fact is arguable, summary judgment must be denied. Jaroslawicz v. Seedman, 528 F.2d 727, 731 (2d Cir. 1975).

**POINT I**

**DEFENDANTS RETALIATED AGAINST PLAINTIFF IN 2010 AND 2011 BECAUSE OF HER OPPOSITION TO THE BOARD'S PROPOSED BOND, IN VIOLATION OF THE FIRST AMENDMENT**

It is well settled that when an individual asserts a speech-based retaliation claim under the First Amendment, she must show that: (1) she engaged in speech which addressed a matter of public concern, (2) she suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action. Konits v. Valley Stream Cent. High School, 394 F.3d 121, 124 (2d Cir. 2005). If the plaintiff satisfies her *prima facie* burden, Defendants must offer a legitimate, non-retaliatory reason for its decision. If proffered, plaintiff must demonstrate that the reason is pretext for unlawful retaliation. Cunningham v. New York State Dep't of Labor, 429 Fed. Appx. 17,19  (2d Cir. 2011). The evidence in this case clearly shows that Plaintiff has established each of the requisite elements with respect to Defendants decision to take action against Plaintiff following her opposition to the bond in November 2010.

**A.     Background**

As of 2010, Ms. Joinnides had worked at the Floral Park-Bellerose Central School District for more than 14 years. (Pl. Ex. G.)[2] Over the course of her employment, Plaintiff received the highest possible rating – outstanding – in every category of all performance evaluation that she received as an employee. (Pl. Ex. H.) During the 2009-2010 school year, Plaintiff worked at John Lewis Child's Elementary as the permanent building substitute, wherein she also worked as a part-time leave replacement teacher for a first grade class and a fifth grade class. (Pl. Ex. B at pp. 53-57, 60.) Both teachers for whom she filled in wrote glowing recommendations for Plaintiff, praising her performance, work ethic, and commitment to students. (Pl. Ex. Q.) At the outset of the 2010-2011 school year, Ms. Joinnides chose to work as a per-diem substitute for the District, while also working part-time two days per week as an educator at the Long Island Children's Museum.

---

[2] All exhibits annexed to the Declaration of Joshua Beldner, are referred to herein as "Pl. Ex. __."

(Pl. Ex. K; Pl. Ex. B at p. 7-8.) As such, Ms. Joinnides continued to work as a per diem substitute for the District in September and October 2010. (Pl. Ex. B at pp. 124-126; Pl. Ex. F at p. 31.)

**B.    Plaintiff's Engages in Protected Speech**

In November 2010, the Board of Education put forth a referendum to the District's taxpayers, proposing a $5 million bond to fund capital improvements in the District. (Pl. Ex. D at p. 59.) The bond referendum was discussed at several public Board meetings. (Pl. Ex. D at pp. 61-62.) Ms. Joinnides and her husband took an aggressive stance against the bond proposed by the District. (Pl. Ex. B at p. 157.) Plaintiff's opposition to the bond was primarily based on the findings contained in an Audit Report that was published by the New York State Comptroller's office in December 2008. (Pl. Ex. L; Pl. Ex. B at p. 287; Joinnides Decl. at ¶ 23.) The Audit Report ("2008 Report") identified "significant deficiencies in a number of areas, including the monitoring of the general fund balance," and states that the District's Board of Education "did not provide sufficient oversight over various district financial operations." (Pl. Ex. L at p. 3.) According to the 2008 Report, "during the period July 1, 2003 through June 30, 2007, District officials consistently overestimated expenditures and underestimated revenues in their annual budgets." (Pl. Ex. L at p. 15.) As a result, the 2008 Report found that "the District's unreserved fund balance was approximately eight times the amount allowed by law at that time." (Pl. Ex. L at p. 14.) The unreserved general fund balance is the sum of money that a District has left over at the end of each school year. (Pl. Ex. D at p. 83.) That money is not specifically reserved for any particular project, is not appropriated to reduce taxes the following year, and may be used at the District's discretion. (Pl. Ex. D at pp. 83-84, 101-102.) According to the 2008 Report, this excessive general fund balance resulted in tax increases to the community during those years which "may have been higher than necessary." (Pl. Ex. L at p. 15.) Dr. Lynn Pombonyo was the District's Superintendent from 2005 to 2012. (Pl. Ex. D at p. 9.)

Ms. Joinnides opposed the bond because she was concerned that the funds generated from the bond could have been comingled, and, once present in the District's unreserved general fund, used at the District's

discretion for things other than capital improvements. (Pl. Ex. B at pp. 201-02; Joinnides Decl. at ¶ 11.) At a Board meeting held on November 8, 2010, Ms. Joinnides and her husband spoke about the merits of using an Energy Savings Company ("ESCO") to fund the capital improvements at the District, rather than a bond paid by taxpayers. (Pl. Ex. B at p. 158.) Ms. Joinnides stated that many school districts on Long Island had used an ESCO for capital improvements, and experienced tremendous savings as a result. (Pl. Ex. B at p. 159.) Following the Board meeting, Plaintiff and her husband wrote a letter to the *Floral Park Dispatch*, published on or about November 12, 2010, that urged residents to vote against the $5 million bond proposed by the District. (Pl. Ex. M.) In addition, Plaintiff handed out flyers to Floral Park residents which urged them to vote against the District's $5 million bond. (Pl. Ex. B at p. 157.) The bond was eventually rejected by Floral Park residents. (Pl. Ex. D at p. 106.)

Defendants do not dispute that when Plaintiff spoke out and expressed opposition to the bond, that she was engaging in activity that is protected by the First Amendment. Therefore, the first element of the analysis is satisfied.

**C.      Plaintiff Suffered an Adverse Employment Action**

Defendants assert that Plaintiff did not suffer an adverse employment action because Plaintiff "voluntarily ceased substituting in October 2010." This is simply untrue. Superintendent Secretary Millie DelGreco testified that Ms. Joinnides left a voice message for her in October 2010, stating that she would not be available to substitute teach in the District for "a while." (Pl. Ex. F at pp. 33-34.) Plaintiff has specifically refuted that testimony, as she never told anyone at the District that she was no longer available to substitute teach. (Pl. Ex. B at pp. 130; 281.) Additionally, Plaintiff never left a message on the District's substitute registry stating that she was not available to teach. (Joinnides Decl. at ¶ 5.) Nevertheless, even if the Court was to accept Ms. DelGreco's testimony (which it should not), there is absolutely no evidence in the record that suggests that Plaintiff expressed to the District that she was not available to teach for the entire remainder of the 2010-2011 school year, or that she intended to no longer work for the District. Plaintiff's testimony that in December 2010

5

she was unsure of her employment status is irrelevant. Ms. Joinnides was unsure of her status within the District because she had not been called to teach in several months. (Pl. Ex. B at p. 278.) Contrary to Defendants' contention, Plaintiff was under no affirmative obligation to call the District to request clarification regarding her status. The undisputed fact is that: (1) prior to engaging in protected speech, Plaintiff received calls to teach in the District; and (2) after engaging in protected speech, Plaintiff did not receive any calls to teach in the District.

In addition, the evidence clearly shows that the District not only stopped calling Plaintiff to work, but actually ***removed her*** from the substitute roster. In the Fall of 2012, when Plaintiff was finally permitted returned to work at the District following Dr. Pombonyo's retirement (if only for a few weeks), Ms. DelGreco directly told Plaintiff "it broke my heart when she made me take you off the list." (Pl. Ex. B pp. 132-133.) Second, a simple review of the rosters from 2010-11 and 2011-12 shows that Plaintiff's name was actually deleted from the 2010-11 list. (Pl. Ex. X.)  Plaintiff's name appears typewritten on the list with all other per-diem substitute teachers on the 2010-2011 list. (Pl. Ex. X.) Plaintiff's name does not appear typed on the 2011-2012 spreadsheet, but rather appears handwritten on the bottom, next to the words "unavailable for 2011-2012." (Pl. Ex. X.) A reasonable jury will likely find that Ms. DelGreco, at some point after Plaintiff's speech, manually removed Plaintiff's name from the list at the direction of Dr. Pombonyo.

Third, it is undisputed that if an individual appeared on the substitute list during the prior school year, he or she would be provided with a letter by the District, inviting them to return as a per diem substitute. (Pl. Ex. D at p. 31.) Plaintiff received this letter, for example, in the summer of 2010. (Pl. Ex. K.) Notably, when Plaintiff inquired in June 2011 regarding an opportunity to work in the District during the 2011-12 school year, she was told that she was required to submit a resume and application, as if she were a first time applicant, and as if she had not been on the list the prior school year. (Pl. Ex. R; Pl. Ex. D at p. 31.) This is further evidence that Plaintiff was actually removed from the substitute list during the 2010-11 school year.

Finally, the undisputed evidence shows that while Plaintiff contacted the District on six separate occasions throughout the summer of 2011 regarding employment opportunities for the upcoming school year, the District never contacted her to offer any position. (Pl. Ex. R; Joinnides Decl. at ¶ 10.) Clearly, the District's decision to: (1) remove Plaintiff from the substitute list; (2) not call her for the remainder of the 2010-11 school year; and (3) not contact her regarding any of the vacancies she applied for with respect to the 2011-12 school year constitutes an adverse employment action. See Rosendale v. Mahoney, 2008 WL 2061266, at *12-13 (S.D.N.Y. 2008) (removing teacher from substitute roster constituted adverse action for purposes of establishing First Amendment retaliation claim.); Santora v. All About You Home Care, LLC., 2012 WL 1964965, at *4 (D. Conn. 2012) (employer's decision to stop giving per diem nurse work assignments constituted adverse employment action.)

**D.      Causal Connection Between Plaintiff's Speech and Adverse Action**

Generally, a plaintiff can establish the causal link either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gilford v. City of New York, 2004 WL 1574695, at *7 (S.D.N.Y. 2004). Here, the evidence clearly demonstrates a causal connection between Plaintiff's protected speech and the adverse action. It is undisputed that Plaintiff was regularly called to work as a substitute in September and October 2010. It is undisputed that Plaintiff engaged in protected activity in November 2010 when she spoke out about the bond. And it is undisputed that following her protected activity, Plaintiff was never called by the District to work again that year. One can hardly imagine a more concrete example of causal connection.

Defendants' sole argument is that the District stopped calling Plaintiff in October 2010, which preceded Plaintiff's speech. This contention must be rejected. First, as already stated, Plaintiff denies ever telling anyone in the District that she was not available to work for the remainder of the 2010-11 school year. However, even if Plaintiff left a message stating that she was not available to substitute for "a while," as Ms.

DelGreco testified, that would still not explain why Plaintiff was: (1) not called for the entire remainder of the school year; and (2) removed from the list entirely. In short, simply because the last day Plaintiff worked was in October does not mean that the District's refusal to call her for the remainder of the year was not based on her November speech. Rather, when considering the other evidence in this case, a reasonable jury could easily find that the District made the decision to remove her from the list because of her protected speech in November 2010. For example, the evidence shows that Dr. Pombonyo (the person who actually directed that Plaintiff be removed from the list) cut Ms. Joinnides off at the Board of Education meeting held on November 8, 2010, and began yelling at her. (Pl. Ex. B at p. 160, 164.) Additionally, the Board of Education wrote a scathing letter in December 2010 which accused Plaintiff's husband of being financially motivated to vote against the bond. (Pl. Ex. O.) Finally, Board members Horan, Ferrone, and Tsoupros each made comments in 2011 in which they expressed that Plaintiff "could not be trusted" because of her outspoken criticism of the District regarding the bond issue. (Pl. Ex. B at p. 188; Pl. Ex. C at p. 50.) Defendants' retaliatory animus is quite clearly illustrated by the evidence presented in this case.

Plaintiff, therefore, has established a causal connection between her protected speech and the adverse action she was subjected to. At the very least, this issue is a factual determination that should be made by a jury. See Giacopelli v. Incorporated Village of Malverne, 2011 WL 6287852, at *13 (E.D.N.Y. 2011) ("in determining the existence of a causal connection between the protected speech and the alleged retaliatory action, the Court is mindful that causation is generally a question for the finder of fact.")

**E.      Plaintiff Has Established Municipal Liability for Purposes of § 1983.**

Generally, to prevail under § 1983, the evidence must show an official policy or custom that causes the plaintiff to be subjected to a denial of a constitutional right. Augustin v. Enlarged City School Dist. of Newburgh, 616 F.Supp.2d 422 (S.D.N.Y. 2009). Significantly, however, the Second Circuit has repeatedly made clear that "to show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation." Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004). Rather, "actions taken by persons

whose activities represent official policy may constitute a custom or policy for § 1983 purposes." <u>Tekula v.</u> <u>Bayport-Blue Point School Dist.</u>, 295 F.Supp.2d 224, 233 (E.D.N.Y. 2003). It is well settled that "when an official has the final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." <u>Nagle v. Marron</u>, 663 F.3d 100, 116 (2d Cir. 2011). Accordingly, municipal liability under § 1983 may even be imposed "by a single decision by municipal policymakers." <u>Id.</u>

Contrary to Defendants' argument, courts have repeatedly found public school superintendents to be "policymakers" for purposes of § 1983. <u>See</u> <u>Brown v. Baldwin Union Free School Dist.</u>, 603 F.Supp.2d 509, 517 (E.D.N.Y. 2009) (denying summary judgment in First Amendment retaliation case where plaintiff asserted superintendent was policymaker in § 1983 action); <u>Tekula v. Bayport-Blue Point Sch. Dist.</u>, 295 F.Supp.2d 224, 234 (E.D.N.Y. 2003) (superintendent was policymaker for establishing § 1983 purposes); <u>Hurdle v. Board of Educ for City of New York</u>, 2003 WL 22080721, at *2 (S.D.N.Y. 2003) (same); <u>Valenti</u> <u>v. Torrington Bd. of Educ.</u>, 601 F.Supp.2d 427, 436 (D. Conn. 2009) (same).

To support their argument, Defendants assert that "Plaintiff has produced no evidence that Dr. Pombonyo had any involvement with calling substitute teachers let alone with Mrs. DelGreco's decision not to contact plaintiff regarding substitute assignments from October 2010 through June 2011." Defendants' contention must be rejected for several reasons. First, there is direct evidence that Dr. Pombonyo was very much involved in the decision to cease calling Plaintiff and remove her from the list, as Ms. DelGreco told Plaintiff that "it broke [her] heart" when Dr. Pombonyo made her take Plaintiff off of the substitute list. (Pl. Ex. B pp. 132-133.) In addition, it is undisputed that the person who maintained the list of per diem substitute teachers reported directly to Dr. Pombonyo, and was therefore under Dr. Pombonyo's direct daily supervision and control. (Pl. Ex. D at pp. 25-26.) Further, it is undisputed that Dr. Pombonyo was directly responsible for: (1) receiving all applications from individuals who wished to work as a substitute at the District; (2) interviewing candidates; and (3) for recommending their appointments to the Board. (Pl. Ex. D at pp. 27-29.) Notably, Dr. Pombonyo testified that over the course of her entire tenure as Superintendent of the District, the

Board *never* rejected a candidate after she made a recommendation to hire. (Pl. Ex. D at p. 16.) Finally, the evidence demonstrates that Dr. Pombonyo herself was not only familiar with the substitute list, but would "very often" go over the substitute list with her subordinate, Ms. DelGreco. (Pl. Ex. D at p. 130.) In fact, according to Dr. Pombonyo, she discussed the substitute list with Ms. DelGreco on a "weekly" basis. (Pl. Ex. D at p. 131.)

Defendants cite to New York Education Law § 2509 for the proposition that the Board, and the Board alone had policymaking authority with respect to the appointment of teachers. This identical argument, however, was flatly rejected by this court in Konits v. Valley Stream Cent. High School Dist., 2006 WL 224188, at *5 (E.D.N.Y. 2006). In Konits, the court noted that New York Education law describes the superintendent as "the chief executive officer of such board [of education] and the educational system and has a seat on the board of education and the right to speak on all matters before the board." Id. Indeed, in that case, the court ruled that "under New York law, for purposes of hiring teachers to fill vacant positions, the superintendent *and* the board of education have policy making authority." Id. (emphasis added). The court in Konits properly ruled that because the superintendent did have policy making authority over such decisions, the District could be held liable for purposes of § 1983. The same analysis applies in this case, especially given Dr. Pombonyo's testimony that the Board always followed her recommendations regarding the staffing of teacher positions. (Pl. Ex. D at p. 16.)

As a result, because Dr. Pombonyo was clearly a "policymaker," Plaintiff has established municipal liability for purposes of § 1983 under Monell. Therefore, Defendants' motion for summary judgment with respect to the adverse action Plaintiff was subjected to during the 2010-2011 school year must be denied.

**POINT II**

**DEFENDANTS RETALIATED AGAINST PLAINTIFF IN OCTOBER 2012 BECAUSE OF HER OPPOSITION TO THE BOND, AND BECAUSE OF HER SPEECH AS MEMBER OF THE CBAC, IN VIOLATION OF THE FIRST AMENDMENT**

**A.     Plaintiff Has Established a Prima Facie Case of Retaliation Based on Her Opposition to Bond**

Defendants argue that Plaintiff cannot establish a causal connection between the District's decision to prohibit her from working in October 2012 and her November 2010 opposition to the bond because the temporal gap is too attenuated. This argument is without merit several reasons. First, while Defendants are correct that generally, a two year gap between a protected activity and an adverse action would be considered too long to establish a causal connection, it must be noted that "while temporal proximity between protected activity and an adverse action can support an inference of unlawful retaliation, [it] is but one factor that must be considered with all others." Curcio v. Roosevelt Union Free School Dist., 2012 WL 3646935, at *13 (E.D.N.Y. 2012). Indeed, courts have determined that despite a long temporal gap, defendants may be found to have retaliated against plaintiffs when it is the first opportunity to do so. See Bucalo v. Shelter Island Union Free School Dist., 2012 WL 3240832, at *9 (2d Cir. 2012) (noting that retaliation claim was properly submitted to jury notwithstanding four (4)-year gap of time because defendant took adverse action "on its first opportunity to do so."); Thomas v. iStar Fin., Inc., 508 F.Supp.2d 252, 257 (S.D.N.Y. 2007) (noting that a delay between activity and retaliation may not preclude a causal connection where a jury could infer that retaliation occurred "on the very first possible occasion following [protected] ... activity."); McKenzie v. Nicholson, 2009 WL 179253 (E.D.N.Y. 2009) (same). Here, as Plaintiff had not worked at the District since she was removed from the substitute list during the 2010-2011 school year, Defendants' first opportunity to retaliate against her with respect to her *employment status* was when she applied for the position in the Fall of 2012.

Significantly, however, Plaintiff is not relying on temporal proximity to show causal connection. It is well settled that a plaintiff "may rely upon circumstantial evidence of retaliatory intent to demonstrate that a nexus exists between his protected speech and the defendant's adverse action against him." Rodriguez v. Clinton, 2009 WL 261203, at *3 (N.D.N.Y.  Feb. 4, 2009). Indeed "evidence of a 'pattern of antagonism' or

of prior retaliatory conduct may serve as circumstantial evidence of retaliation." <u>Housing Works, Inc. v. City of New York</u>, 72 F.Supp.2d 402, 426 (S.D.N.Y. 1999). In this case, as set forth above, the evidence establishes a pattern of retaliatory behavior by Defendants following her November 2010 speech by: (1) removing her from the substitute list; (2) not calling her to work for the remainder of the school year; and (3) not contacting her following her multiple requests for an opportunity to work that she sent during the summer of 2011.

Plaintiff has also established a pattern of "antagonism" by the Board following her November 2010 speech. In particular, the Board wrote a letter, which was published in the local newspaper that falsely implied that Plaintiff's husband's opposition to the bond was based on a financial interest.  The individual who wrote the letter, Board member Bob Burke, even admitted to Ms. Joinnides that he believed that her husband worked for an ESCO in November 2010. (Pl. Ex. B at pp. 160-161.) Moreover, in October 2011, Board members Ferrone, Horan, and Tsoupros (all members of the Board in the Fall of 2012) each commented that Plaintiff "could not be trusted" specifically because of her opposition to the bond the prior year. Each of the aforementioned comments and actions by the Board constitute circumstantial evidence of retaliatory intent.

The evidence also suggests, however, that Plaintiff's opposition to the bond was still at the forefront of Board members' minds in the Fall of 2012. In fact, Superintendent Opiekun confirmed that in 2012, Board members spoke to him about Plaintiff's opposition to the proposed bond, and indicated to him that "it wasn't the right way to go." (Pl. Ex. E at pp. 91-92.) Assistant Superintendent Fabiano also told Mr. Opiekun that Plaintiff had opposed the bond when Mr. Opiekun first took over the position in July 2012. (Pl. Ex. E at p. 93.) At the start of the 2012-13 school year, the District was several years removed from the bond issue, and yet its administrators and Board members nevertheless felt compelled to tell the new superintendent about Plaintiff's opposition to the bond. Clearly then, even in 2012, Plaintiff's opposition to the bond remained an "issue" for several members of the Board and the District's administration.

Indeed, at his meeting with Plaintiff in October 2012, Mr. Opiekun even referenced this very topic when he stated "every school has an institutional memory, and ***this Board of Education seems to have a long***

*institutional memory*." (Pl. Ex. B at p. 236.) (emphasis added). At his deposition, Mr. Opiekun admitted that

he referenced the District's "institutional memory," which he acknowledged "can shape decisions about

people." (Pl. Ex. E at pp. 66-67.) Mr. Opiekun also stated that the Board was afraid that Ms. Joinnides would

"blur the line" between taxpayer and employee, and that he expected employees to be "good will ambassadors"

for the District. (Pl. Ex. B at pp. 234, 236.) It is certainly plausible, if not likely, that these comments from Mr.

Opiekun referred to Plaintiff's protected activity in 2010, especially when considering the Board's history of

retaliating against Plaintiff, the angry letter the Board published regarding Plaintiff's husband, and the

comments made by Board members that Plaintiff "could not be trusted" because of her opposition to the bond.

In fact, Mr. Opiekun's comments, which sufficiently illustrate Defendants' motives in denying Plaintiff

employment in 2012, actually constitute *direct evidence* of Defendants' retaliatory intent.  Significantly, where

"there is direct evidence of retaliatory animus, a close temporal connection between complaints and adverse

employment action is not as critical." Thomas, 508 F.Supp.2d at 257. See also  Mandell v. County of Suffolk,

316 F.3d 368, 383 (2d Cir. 2003) (plaintiff established causal connection despite a five year lapse between the

plaintiff's First Amendment protected activity and the adverse actions because there was direct evidence of

retaliation.)

     Here, because Plaintiff has established direct and indirect evidence of Defendants' retaliatory intent,

she has established a *prima facie* case of retaliation relating to her 2010 protected speech.

**B**.     **Plaintiff Has Established a Prima Facie Case of Retaliation Based on Her CBAC Activity**

*1.*     <u>*Plaintiff's Speech Touched Upon Matters of Public Concern*</u>

     As a member of the CBAC, Ms. Joinnides expressed strong opinions regarding certain District

proposals, programs and expenditures. (Joinnides Decl. at ¶ 17; Pl. Ex. D at p. 140.) Specifically, Plaintiff felt,

as many community residents did, that the District's Administration was "top heavy," and that the cost of

Administrators' salaries was too high. (Pl. Ex. B at pp. 193-94; Joinnides Decl. at ¶ 17.) Ms. Joinnides also

openly criticized Board policies that she felt were not in the best interests of community residents, including

the consistent overestimation of budget expenditures, and the mismanagement of financial resources. (Pl. Ex. B at pp. 219-220; Pl. Ex. C at p. 106; Joinnides Decl. at ¶ 17.)  Plaintiff also strongly advocated against fiscal cuts to academic programs in the District. (Pl. Ex. B at p. 220; Joinnides Decl. at ¶ 17.) It is undisputed that Plaintiff's criticism of the District's high administrative salaries, overestimation of budgetary expenditures, mismanagement of financial resources, and cuts to academic programs touched upon matters of public concern. Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) ("speech on any matter of political, social, or other concern to the community is protected by the First Amendment."); Bieluch v. Sullivan, 999 F.2d 666, 671 (2d Cir. 1993) (tax expenditures and budgets are "matters of utmost public concern.")

Defendants, however, contend that Plaintiff is unable to establish that her participation, speech, and activity on the CBAC was protected by the First Amendment, because, according to Defendants, Ms. Joinnides was motivated solely by "redressing personal grievances." This argument fails for several reasons. First, the mere fact that Ms. Joinnides admitted in emails that she was angry at the Board for its prior maltreatment of her and her husband does not in any way make her criticisms of Defendants less true, less legitimate, or less worthy of First Amendment protection. Although Plaintiff used the word "vendetta" in an email, her testimony made clear that she only used that term because that was the word that had been used by others who questioned her motives when she expressed her suspicions about the Board. (Pl. Ex. B at pp. 213-14.) A review of the email cited by Defendants wherein Plaintiff referenced a "vendetta" clearly shows that in the preceding paragraph, Plaintiff was expressing strong criticism regarding the overestimation of budgetary expenditures such as masonry, and the high cost of salaries for District administrators. (Def. Ex. BB.)

Second, the evidence demonstrates that while Plaintiff herself did not trust and support the Board, she nevertheless offered assistance to Defendants as to how to market the bond and budget that she personally opposed. (Def. Ex. B at p. 211.) Specifically, Plaintiff suggested that: (1) Dr. Pombonyo and Mr. Fabiano appear on local television to explain the budget; (2) Dr. Pombonyo address the Wednesday Mother's Club, because that was the demographic of the population that would likely be coming out to vote in favor of the

budget; and (3) the District should have teachers stationed at tables at opening day of the softball season to provide information about the bond and budget. (Pl. Ex. B at pp. 211-12; Pl. Ex. Y.) Clearly, if Plaintiff's criticism of Defendants was solely motivated by malice and she was somehow attempting to sabotage the Board's efforts, as Defendants suggest, she would not have offered such constructive advice. Rather, as was made clear at her deposition, Ms. Joinnides did not allow her personal feelings regarding the Board to cloud her responsibilities on the CBAC, or influence her judgment. (Pl. Ex. B at p. 211-212; Pl. Ex. C at 102.) In particular, she testified, "[regardless] of my personal feelings, I was charged as a member – a representative who speaks [for] the community whose responsibility was to carry out the public trust and bring forth their opinion." (Pl. Ex. B at p. 212.)

Third, Plaintiff's complaints about the budget and District expenditures were completely validated by the New York State Comptroller's Office Audit Report published in February 2014 ("2014 Report.") (Pl. Ex. Z.) The 2014 Report, which covered July 2011 to June 2013, reflects precisely the same criticism that Plaintiff had expressed as a member of the CBAC several years earlier. In particular, the 2014 Report states that "the Board routinely overestimated expenditures and appropriated unexpended surplus fund balance that was not actually needed to sustain District operations. This made it appear that the District was staying within the 4 percent statutory fund balance limit. As a result, the District maintained more excess unexpended surplus funds than needed to fund future District operations. Because of this, ***the District levied and collected more taxes than necessary to fund District operations.***" (Pl. Ex. Z at p. 7.) (emphasis added). Unfortunately for Floral Park residents and taxpayers, the complaints and concerns that Plaintiff raised as a member of the CBAC regarding the Board's budgetary practices were all proven to be legitimate and accurate.

Finally, even if Plaintiff was motivated solely by personal grievance (which she was not), Defendants' argument still fails. It is well settled that while motive "may be one factor in determining whether it is a matter of public concern, motive is not, standing alone, dispositive or conclusive." Sousa v. Roque, 578 F.3d 164, 170, 175 (2d Cir. 2009). Indeed, in Sousa, the Second Circuit made clear that "it does not follow that a person

motivated by a personal grievance cannot be speaking on a matter of public concern." See also Cioffi v. Averill Park Cent. School Dist. Bd. of Educ., 444 F.3d 158, 166 (2d Cir. 2006) ("We do not doubt that [plaintiff] spoke partly to protect his job and shift blame to other administrators. But personal interests frequently induce speech that is nonetheless of public concern."); Hueston v. City of New York, 2005 WL 53256, at *7 (S.D.N.Y. 2005) (holding that even though plaintiff's statements encompassed "his personal problems with working conditions," his statements were nevertheless protected because they also "addressed an issue of fundamental importance to local government.") There can be no doubt that Plaintiff's speech, even if it was motivated in part by her dislike and distrust of the Board, touched upon matters of public concern and were therefore protected by the First Amendment.

2.    *Plaintiff Was Speaking Out As a "Citizen," and Not an "Employee"*

Defendants assert that Plaintiff's speech on the CBAC was not protected because it was made "pursuant to her duties as a CBAC member." This argument is nonsensical. To support their position, Defendants rely primarily on Isenalumhe v. McDuffie, 697 F.Supp.2d 367 (E.D.N.Y. 2010), where the Court ruled that two college professors could not maintain First Amendment claims based on complaints they made as members of a committee they chose to serve on for the college they worked for. The court in Isenalhume analyzed the claims under the seminal Supreme Court case of Garcetti v. Ceballos, 547 U.S. 410 (2006) to determine whether the professors were speaking as "citizens" or "employees," and ruled that because their complaints were "undertaken in the course of performing their responsibilities as committee members," said complaints were made as "employees" rather than "citizens." Isenalhume, 697 F.Supp.2d at 378-79.

This case is readily distinguishable. Unlike the plaintiffs in Isenalhume, it is undisputed that at the time Ms. Joinnides served on the CBAC from October 2011 to June 2012, she was not employed by Defendants. Therefore, it is not necessary for this Court to even apply the Garcetti analysis to Plaintiff's claims. Ms. Joinnides could not have been speaking out as an "employee" when she was not employed by Defendants at the time she engaged in such speech. Judge Block's reasoning in Isenalhume, therefore, is completely

inapplicable here. Indeed, all of the cases cited by Defendants to support their argument are inapplicable, because in each case cited, the plaintiff was employed at the time he or she engaged in such speech. See Koubek v. County of Nassau, 2012 WL 1107734 (E.D.N.Y. 2012) (plaintiff employed by Nassau County at the time of speech); Shub v. Westchester Co. College, 556 F.Supp.2d 227 (S.D.N.Y. 2008) (plaintiff employed as an associate professor by defendant college at the time of speech); Ross v. Breslin, 693 F.3d 300 (2d Cir. 2012) (plaintiff employed as payroll clerk for school district at the time of speech).

In this case, the evidence shows that Defendants refused to hire Plaintiff because of speech that Plaintiff made as a private citizen serving on the aptly titled Citizens Budget Advisory Committee. Therefore, Defendants' contention that her speech was not protected because she was speaking as an "employee," when she was not even employed, must be rejected.

**C.      Defendants' Reason For Refusing to Hire Plaintiff Is Pretextual**

Defendants assert that the reason the Board and the District refused to hire Ms. Joinnides in 2012 was due to the "inappropriate behavior" that she allegedly exhibited as a member of the CBAC. Initially, it must be noted that Defendants' justification for its decision is premised **_entirely_** on activity that is clearly protected by the First Amendment – Plaintiff's activity as a member of the CBAC. Therefore, the Court need not even analyze the pretext argument because Defendants have themselves admitted that Plaintiff's protected activity was the reason for their decision. Nevertheless, assuming, _arguendo_, that Defendants have satisfied their minimal burden of establishing a "non-retaliatory reason" for its decision, the burden shifts to Plaintiff to show that the evidence in the record suggests that the reasons asserted are false and pretextual. In so doing, Plaintiff may rely solely on the evidence establishing her _prima facie_ case. Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995). As set forth below, the overwhelming evidence presented demonstrates that Defendants' justification is not only false, but pretext to disguise its true retaliatory motives.

1.   _Defendants' Justification is False_

To support its justification that Plaintiff's behavior as a member of the CBAC was "so erratic that it called into question her fitness to be a substitute," Defendants first note that Plaintiff sent emails to another member of the CBAC that contained profanity.   To be clear, Plaintiff did send private emails to CBAC Chairperson Joseph Pepe which did, at times, contain "foul" language. However, Defendants have presented a grand total of four emails from Plaintiff to Mr. Pepe, sent over the course of the ***eight months*** that she served on the CBAC, in which she used such language. (Def Exs. X, Y, Z, AA.) Further, in each of the emails presented, Ms. Joinnides and Mr. Pepe were discussing the District's budgetary proposals, and she used strong language to outline the reasons why she was skeptical of said proposals—namely that she did not trust Defendants, given their well-documented history of misleading taxpayers. For example, in February 2012, while she referred to the Board as "sons of bitches," and stated that Dr. Pombonyo had "stolen from us before," she actually wrote:

> My concern with the bond is as it always has been, see my attachment. Those sons of bitches say we will get 44% back on the dollar from the state. Ok, but what will we do with that money? Of course it should go to pay down the debt, but now as the last time around I do not believe that it is their intent. You need to ask where the state aid monies will go, is it going into the general reserve fund (then they can use it for whatever purpose they want) or to pay down the debt which would be in accordance with GAP Good Accounting Practices. Lynn has stolen from us before, read the NY State Comptroller's Audit of this district where you will see that under Lynn's reign the Unreserved Fund Balance was more than 6 times the amount allowed by law. . ."

(Def. Ex. Y.) As she testified, Plaintiff's concern regarding misappropriation of funds was based on the  New York State Comptroller's Audit Report ("2008 Report'), which condemned Defendants for misallocating public money towards the District's unreserved general fund, and levying higher taxes than were necessary. (Pl. Ex. C at pp. 106-07; Pl. Ex. L at pp. 14-15.) Thus, Ms. Joinnides was not, as Defendants suggest, indiscriminately lobbing insults about the Board because she didn't like them. Moreover, all of the emails cited

by Defendants as "inappropriate" were private emails between Plaintiff and Mr. Pepe.[3] Ms. Joinnides viewed

Mr. Pepe as a friend, was comfortable speaking to him candidly, and had the expectation that her emails to

him would remain private. (Pl. Ex. B at pp. 208-09; Pl. Ex. C at p. 110; Joinnides Decl. at ¶ 27.) Of course, the

record is completely devoid of any evidence that would suggest that Plaintiff ever used foul language in the

emails that she had sent to the entire committee, or that she ever used foul language in her direct dealings with

Board members or administrators, or at CBAC meetings.

Defendants further claim that the "profane" emails between Ms. Joinnides and Mr. Pepe "were

forwarded to the Board prior to considering Plaintiff's application to be a substitute teacher." Plaintiff plainly

disputes that assertion. To support that "fact," Defendants cite to Mr. Opiekun's deposition testimony, in which

he stated that he "assumed" the Board had reviewed the emails prior to making its decision. (Pl. Ex. E at pp.

97-98.) Defendants, however, have failed to present *actual evidence* which would demonstrate that the Board

had reviewed and considered Plaintiff's emails to Mr. Pepe prior to making its decision regarding her

application in October 2012.[4] Indeed, Mr. Opiekun specifically confirmed that he had never seen the emails

in question. (Pl. Ex. E at p. 97.)

---

[3] Plaintiff did send one email in June 2012 to CBAC member Glen Rettinger's email account in which she used foul language when referring to the Board. (Def. Ex. KK.) However, this email was sent in response to an email conversation forwarded to Plaintiff by Mr. Rettinger's wife which stated "for your reading enjoyment." Specifically, Ms. Rettinger forwarded Plaintiff an email chain between herself and Board Member Denise Dellacorte, in which Ms. Rettinger stated "Unfortunately, my statement last night did not come from me alone. It came from the Community. I thought it would be best for the BOE to know the TRUTH regarding how the Community feels and what they are up against." (Def. Ex. KK.) Ms. Rettinger answered Plaintiff's response by writing "Well, now we all know that the BOE is happiest when the public is uninformed." (Def. Ex. KK.) It should also be noted that this email exchange was provided by Plaintiff in discovery in July 2015. As a result, Defendants could not have relied upon it in October 2012 when they decided that Plaintiff was not permitted to work in the District.

[4] It must be noted that Defendants responded to Plaintiff's Discovery Requests in May 2013 by producing 343 documents, including internal emails between members of the CBAC. (Beldner Decl. at ¶ 37.) None of the "profane" emails between Plaintiff and Mr. Pepe cited by Defendants were included in this production. (Id.) Four months later, on September 16, 2013, two days prior to Plaintiff's deposition, counsel for Defendants requested that the deposition be postponed because Defendants were in the process of gathering additional documents. (Id. at ¶ 38.) On September 20, 2013, Defendants produced a new batch of documents, which include all of the private emails between Mr. Pepe and Plaintiff, including the four "profane" emails cited by Defendants. (Id. at ¶ 39.) Therefore, unless counsel for Defendants purposefully delayed the production of these documents (which Plaintiff does not suggest), it is highly unlikely that the Board ever reviewed the emails at issue prior to making the decision in October 2012.

Additionally, Defendants assert that Plaintiff was "repeatedly rude" during CBAC meetings. The evidence indicates that this claim is simply untrue. While Ms. Joinnides did passionately advocate for her positions on behalf of the community, she never acted in a manner that was rude or disrespectful towards any individuals while at CBAC meetings.  (Pl. Ex. C at p. 108; Joinnides Decl. at ¶ 20.) According to CBAC member Glen Rettinger, while Plaintiff did, at times, express criticism and frustration regarding certain Board proposals, she did ***not*** act in a manner that was rude, abusive, disrespectful, or demeaning towards anyone. (Rettinger Decl. at   ¶  6). Mr. Rettinger categorically rejects Defendants' claim that Plaintiff ever acted inappropriately, erratically, or disruptively as a member of the CBAC. (Rettinger Decl. at ¶ 8.) In fact, according to Mr. Rettinger, Plaintiff was respectful of other individuals' opinions and ideas regarding the budget, even if she did not agree with them. (Rettinger Decl. at ¶ 8.) Tellingly, while Board member Laura Ferrone submitted an affidavit on behalf of Defendants in which she attests that Plaintiff was "often visibly rude" to Dr. Pombonyo at CBAC meetings, Dr. Pombonyo herself testified in this case, and at no point did she ever state that Ms. Joinnides was rude or disrespectful towards her, despite being asked to describe Plaintiff's behavior at CBAC meetings. (Pl. Ex. D at pp. 137-144.)[5] Dr. Pombonyo further testified that she did not believe that Ms. Joinnides was a "divisive" force on the Committee. (Pl. Ex. D at p. 146.)

Defendants also take issue with the fact that Ms. Joinnides interrupted others during CBAC meetings. Ms. Joinnides did not intentionally interrupt anyone at CBAC meetings. (Joinnides Decl. at ¶ 22.) If Plaintiff asked presenters to repeat, or clarify themselves, it was because she wanted to make sure that she clearly understood all parties' positions, so she could make fully informed decisions. (Pl. Ex. C at p. 94; Joinnides Decl. at ¶ 22.). Dr. Pombonyo testified that Plaintiff interrupted Assistant Superintendent Fabiano on one occasion while he made a presentation regarding the budget. According to Dr. Pombonyo, as Mr. Fabiano

---

[5] Ms. Ferrone is also one of the Board members who brought up the bond issue to Plaintiff in October 2011 and said "you were very vocal about the bond issue. How do you know we can trust you?" (Pl. Ex. C at p. 50.) Additionally, Ms. Ferrone was the first Board member to approach Mr. Opiekun in October 2012 to alert him that there were "issues" regarding Plaintiff working at the District. (Pl. Ex. E at p. 37.)

presented things, Plaintiff said "no, but you said something else last week." (Pl. Ex. D at p. 143.) However, Dr. Pombonyo acknowledged that Mr. Fabiano *did* say different things in different weeks, and further testified that in interrupting Mr. Fabiano, Plaintiff was not criticizing the District in an inappropriate manner. (Pl. Ex. D at p. 143-44.)

Additionally, it should be noted that Ms. Joinnides was often very sick, sore, and weak at CBAC meetings, due to the chemotherapy treatment she was receiving at the time. (Joinnides Decl. at ¶ 20.) In fact, due to her illness, Ms. Joinnides only felt well enough to attend three of the nine CBAC meetings in person. (Pl. Ex. S.)[6] Given Plaintiff's physical condition at the time in question, Defendants' attempt to portray Ms. Joinnides as some loud mouthed, rowdy, and abusive presence at CBAC meetings is, frankly, absurd.

Finally, despite Plaintiff's allegedly "disruptive" behavior, the evidence shows that CBAC Chairperson Pepe practically begged Ms. Joinnides to remain on the Committee in May 2012. Mr. Pepe wrote:

> I think Patsy that you were *the lead voice* in this Committee. That is quite an accomplishment for you to have achieved since you missed so many meetings because of your health issues.

> Once you were feeling a little better you participate[d] by telephone and *at each meeting you made very significant contributions*. You started to really participate when we were getting down to the time to make recommendations.

> If I'm not mistaken every Committee recommendation came very close, if not exactly what you recommended [as] an individual member.

> *I do not want to lose you as a future member so please stay with this*. You and Jim have been very instrumental in making contributions and shedding light on different issues. You have a good following who have confided in you and that is important to keep the line of communication open.

(Pl. Ex. T) (emphasis added). Mr. Pepe's description of Plaintiff's service, contributions, and "behavior" on the CBAC certainly does not comport with the narrative presented by Defendants in this case to support its justification for denying her employment.

---

[6] In January 2012, Plaintiff also underwent a serious surgical procedure, which included the removal of her bladder, appendix, uterus, ovaries, cervix, part of her small intestine, part of her large intestine, and more than 30 lymph nodes. (Pl. Ex. C at p. 11-12; Joinnides Decl. at ¶ 21.) This surgery also caused Plaintiff to miss CBAC meetings.

In short, record clearly shows that the justification provided by Defendants is simply not supported by the evidence presented in this case.

4.      _The Evidence in the Record Clearly Establishes Retaliatory Intent._

Defendants have asserted that the reason they denied Plaintiff a position teaching for the District in October 2012 was because of her allegedly inappropriate behavior while she was a member of the CBAC. Incredibly, Defendants have also asserted that whether Plaintiff **actually** acted inappropriately while she was a member of the CBAC is "irrelevant" for purposes of analyzing her retaliation claim. Rather, Defendants contend that as long as they had a "good faith basis" for believing that Plaintiff had acted inappropriately, that is sufficient to support their position that she was "generally unfit for teaching children." This argument is wholly without merit for a multitude of reasons.

First, by providing evidence which demonstrates that Defendants' explanation is false, the court "can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a [retaliatory] purpose." Lamberg v. McCann Erickson, 543 F.Supp.2d 265, 278 (S.D.N.Y. 2008) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147 (2000)). As set forth already, Defendants' justification is simply not supported by the evidence. See Williams v. Regus Management Group LLC, 836 F.Supp.2d 159, 174 (S.D.N.Y. 2011) ("The factfinder may disbelieve the defendant's explanation either because the facts underlying the explanation are false or because the explanation is weakened by inconsistencies or logical flaws."); Ramos v. Marriot Intern., Inc. 134 F.Supp.2d 328, 345 (S.D.N.Y. 2001) ("a plaintiff may establish pretext and thereby successfully oppose summary judgment. . . by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action.") Moreover, Defendants' reliance on the cases cited in their brief to support the "good faith basis" argument is misplaced. This is not a case, for example, in which an employer is provided with negative information about an employee, and then chose to take action based on that negative information. The decision-makers in this case were the members of the Board. Members of the Board, however, also served

22

on the CBAC with Plaintiff. (Pl. Ex. D at p. 137.) Thus, unlike in the cases cited by Defendants, the decision-makers here had direct knowledge that Plaintiff never engaged the behavior which they later deemed "disruptive," because they were actually present. In other words, Defendants could not possibly have a "good faith belief."

Nevertheless, even if the Court were to credit Defendants' arguments, and assume that: (1) Ms. Joinnides did act "rudely" to others at the three CBAC meetings she attended (she did not); and (2) the Board did review all four of the emails she wrote to Mr. Pepe which contained curse words prior to making their decision (they did not), that *still* would not support Defendants "non-retaliatory" justification for refusing to hire her—which was that she was "unfit to be around children." Ms. Joinnides was not a new applicant who had never worked in the District before. The Board knew Plaintiff the employee, because she had worked at the District for more than *14 years*. (Pl. Ex. G.) All of her performance evaluations were outstanding. (Pl. Ex. H.). No student had ever complained about her behavior. (Pl. Ex. G; Pl. Ex. E at pp. 71-72; Pl. Ex. D at pp. 37-38, 44-45.) No parent had ever complained about her behavior. (Pl. Ex. G; Pl. Ex. E at pp. 71-72; Pl. Ex. D at pp. 37-38, 44-45.) No colleague or supervisor had ever complained about her behavior. (Pl. Ex. G; Pl. Ex. E at pp. 71-72; Pl. Ex. D at pp. 37-38, 44-45.)  Ms. Joinnides had never been subject to discipline of any kind while employed by the District. (Pl. Ex. D at p. 38.) In fact, Plaintiff worked for four days as a substitute teacher in the Fall of 2012, and there were no issues, complaints, or problems. (Pl. Ex. E at pp. 71-72.) It is simply not credible to accept the proposition that the Defendants truly believed that Plaintiff was somehow a danger to students simply because she used foul language in a handful of emails to another adult, despite an unblemished record of 14 years working in the District.[7] Thus, even if the Board reviewed the emails containing foul language prior to making its decision (which Plaintiff disputes), a reasonable jury would likely determine that

---

[7] Incredibly, Mr. Opiekun testified that he was concerned about Plaintiff working at the District because she told him at their meeting that she loved the children and enjoyed watching them grow up. (Pl. Ex. E at p. 86.)

the only aspect of the emails that truly troubled Defendants was the fact that Plaintiff was using foul language in those emails *to criticize the Board.*

Despite the utter absurdity of Defendants' justification, Plaintiff recognizes that in addition to proving the falsity of Defendants' explanation, she must also offer additional evidence that would suggest that retaliation was the real reason behind Defendants' decision. The record in this case contains such evidence. As already set forth, there is a long history between Plaintiff and Defendants, which includes evidence of prior retaliatory acts. Specifically, in the employment context, "the entire history of defendants' unlawful retaliation can be considered by the fact-finder." Peele v. New York City Dept. of Social Services, 1994 WL 389160, at *11 (S.D.N.Y. 1994). See also Shub v. Westchester Community College, 556 F.Supp.2d 227, 246 (S.D.N.Y 2008) ("evidence of an ongoing pattern of retaliatory conduct and intent can establish causal connection"); Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994).

More importantly, history aside, there is clear *direct* evidence of retaliatory intent. It is well established that "actions or remarks made by decisionmakers that could be viewed as reflecting discriminatory animus may give rise to an inference of discriminatory motive." Gregory v. Daly, 243 F.3d 687, 697 (2d Cir. 2001). Superintendent Opiekun admitted that the Board members told him that Plaintiff had been "very critical" of the Board while she was serving as a member on the CBAC. (Pl. Ex. E at p. 51.) He even told Plaintiff that he expected employees to be "good will ambassadors" for the District. (Pl. Ex. B at p. 236; Pl. Ex. V.) Clearly, when Mr. Opiekun told Plaintiff that he expected employees to be "good will ambassadors," he was discussing his expectation that employees not be critical of the Board. Mr. Opiekun also referenced the Board's "long institutional memory," and further stated that the Board was afraid that she would "blur the lines" between taxpayer/homeowner and employee of the District. (Pl. Ex. B at p. 234, 236.) At his deposition, Mr. Opiekun testified that "what I meant by that was that, what I found in my experience is that a resident who was also an employee is under – has a different filter than somebody that does not live in the district." (Pl. Ex. at p. 70.) Mr. Opiekun told Plaintiff that the Board was "afraid that if you see something wrong, you will talk about it."

(Pl. Ex. B at p. 234.) Mr. Opiekun's statements, which were made directly to Ms. Joinnides, accurately sheds light on Defendants' mindset with respect to its decision to deny Plaintiff employment at the District. Ms. Joinnides had been critical of the Board in the past, both with respect to the bond issue, and during her time on the CBAC. As three different Board members have made clear in various statements, Ms. Joinnides demonstrated to them that by expressing opposition to the Board's positions and proposals over the years, she "could not be trusted." (Pl. Ex. B at p. 188; Pl. Ex. C at p. 50.) Expressing such dissenting opinion, however, is precisely the type of speech and activity that the First Amendment is designed to protect, and it simply cannot serve as the "legitimate" basis for Defendants to deny Plaintiff employment.

At the very least, it is readily apparent that there exists an abundance of unresolved issues of fact which are in dispute. These factual determinations, however, must be made by a jury at trial. It is axiomatic that the "responsibility of the court in deciding a summary-judgment motion 'is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party.'" Yu v. New York City Housing Development Corp., 2011 WL 2326892, at *22 (S.D.N.Y. 2011) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986)). Likewise, it should be noted that "the issue of pretext is 'ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment.'" Shain v. Center for Jewish History, Inc., 418 F.Supp.2d 360, 366 (S.D.N.Y. 2005) (quoting Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001)).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied in its entirety, and Plaintiff should be provided with such other relief that the Court deems just and proper.

Dated:  February 17, 2016
Uniondale, NY

Joshua Beldner