UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
PATSY JOINNIDES,

                          Plaintiff,

          -against-                              <u>MEMORANDUM & ORDER</u>
                                                 12-CV-5682(JS)(AKT)
FLORAL PARK-BELLEROSE UNION FREE
SCHOOL DISTRICT, and BOARD OF EDUCATION
OF FLORAL PARK-BELLEROSE UNION FREE
SCHOOL DISTRICT,

                          Defendants.
----------------------------------------x
APPEARANCES
For Plaintiff:          Joshua S. Beldner, Esq.
                        Tilton Beldner LLP
                        193 East Main Street
                        Babylon, NY 11702

For Defendant:          Michael Miranda, Esq.
                        Richard B. Epstein, Esq.
                        Miranda Sambursky Sloan Sklarin
                             Verveniotis LLP
                        240 Mineola Blvd.
                        Mineola, NY 11501


SEYBERT, District Judge:

          Plaintiff Patsy Joinnides ("Plaintiff") commenced this

action pursuant to 42 U.S.C. § 1983 alleging retaliation in

contravention of the First Amendment.[1]  Presently pending before

the Court is defendants Floral Park-Bellerose Union Free School

District (the "District") and Board of Education of Floral Park-

Bellerose Union Free School District's (the "Board" and

---

[1] The Complaint also asserts a claim for age discrimination in
violation of the Equal Protection Clause that Plaintiff has
abandoned.  (Pl.'s Br., Docket Entry 68, at 1, n. 1.)

collectively, "Defendants") motion for summary judgment. (Docket Entry 57.) For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

<u>BACKGROUND</u>[2]

Plaintiff was employed as a part-time Title I Reading Assistant at the District's John Lewis Childs School ("JLCS") from October 1996 through June 2002. (Defs.' 56.1 Stmt., Docket Entry 62, ¶ 11.) From 2002 through 2008, Plaintiff worked as a Special Education Assistant at JLCS. (Defs.' 56.1 Stmt. ¶ 16.) In 2009, Plaintiff obtained her Master's Degree in Childhood Education and her Teacher's Certification. That same year, she began substitute teaching in the Garden City, Franklin Square, and Floral Park-Bellerose School Districts. (Defs.' 56.1 Stmt. ¶¶ 10, 18, 22.)

During the 2009-2010 school year, Plaintiff worked as a permanent building substitute at JLCS. (Pl.'s 56.1 Counterstmt., Docket Entry 67, ¶ 3.1.) From January 2010 through March 2010, Plaintiff served as a temporary leave replacement for a first grade class at JLCS. (Defs.' 56.1 Stmt. ¶ 30.) From May 2010 through June 2010, Plaintiff was also appointed to a temporary leave replacement position for a fifth grade class at JLCS. (Defs.' 56.1 Stmt. ¶ 34.)

---

[2] The following material facts are drawn from Defendants' Local Civil Rule 56.1 Statement and Plaintiff's Local Civil Rule 56.1 Counterstatement. Any relevant factual disputes are noted. All internal quotation marks and citations have been omitted.

In June 2010, Plaintiff interviewed for a full-year leave replacement position for a first grade class at JLCS. (Defs.' 56.1 Stmt. ¶¶ 4, 38.)  The interview committee consisted of JLCS' principal and assistant principal, Special Education teacher Bridgette Stegmeir ("Stegmeir"), and Assistant to the Superintendent for Curriculum and Instruction Caroline Schozer ("Schozer").  (Defs.' 56.1 Stmt. ¶ 36.)  The committee unanimously concluded that Plaintiff was not the most qualified applicant. (Defs.' 56.1 Stmt. ¶¶ 39, 40.)  However, Plaintiff alleges that Steigmeir advised her that "she performed very well" but that another applicant, Jessica Anzelone, would receive the position "because of her relationship with [Schozer]."  (Pl.'s 56.1 Counterstmt. ¶¶ 39-40.1.)

I. <u>Per Diem Substitute Teacher List</u>

After Plaintiff did not receive the full-year leave position, she declined the District's offer to resume her position as the full-time building substitute at JLCS.  (Defs.' 56.1 Stmt. ¶ 68.)  Plaintiff began working at the Long Island Children's Museum (the "Museum") in September 2010, where she worked two days per week from October 2010 until August 2011.  (Defs.' 56.1 Stmt. ¶¶ 70-71.)

Before Plaintiff began working at the Museum, she accepted the District's offer to be included on their per diem substitute teacher list (the "Substitute List").  (Defs.' 56.1

Stmt. ¶ 73.) The District's Substitute List is maintained by Millie DelGreco ("DelGreco"), Secretary to the Superintendent. (Defs.' 56.1 Stmt. ¶¶ 75-77; Pl.'s 56.1 Counterstmt. ¶ 75.1.) Defendants allege that it was DelGreco's "sole[ ] responsibility" to assign the per diem substitute teachers, (Defs.' 56.1 Stmt. ¶ 81), while Plaintiff alleges that Superintendent Lynn Pombonyo ("Pombonyo") had weekly conversations with DelGreco about the substitute list and "would very often go over the substitute list with Ms. DelGreco," (Pl.'s 56.1 Counterstmt. ¶ 81.1). Plaintiff also alleges that DelGreco informed Pombonyo when "individuals informed the District that they would no longer be able to work as a per diem substitute." (Pl.'s 56.1 Counterstmt. ¶ 81.2.) Plaintiff acknowledges, however, that DelGreco testified that she and Pombonyo did not discuss the substitute list. (Pl.'s 56.1 Counterstmt. ¶ 81.3.) The parties do not dispute that Plaintiff's name appeared on the Substitute List for the 2010-2011 school year. (Defs.' 56.1 Counterstmt.    ¶ 79.)

The parties dispute whether, as a matter of practice, DelGreco would call Plaintiff to see if she was available to work, or Plaintiff would call DelGreco to request work. (Defs.' 56.1 Stmt. ¶ 83; Pl.'s 56.1 Counterstmt. ¶ 83-83.2.) After Plaintiff began working at the Museum, she advised DelGreco that she was only available to substitute teach three days per week. (Defs.' 56.1 Stmt. ¶ 86.) Defendants allege that after Plaintiff began

working at the Museum, "DelGreco would call Plaintiff to substitute, but Plaintiff advised DelGreco that she was not available." (Defs.' 56.1 Stmt. ¶ 87.) Plaintiff alleges that while there were occasions where DelGreco called and she advised that she was unavailable, Plaintiff "did not specifically recall telling Ms. DelGreco that she was not available to substitute in October or November 2010." (Pl.'s 56.1 Counterstmt. ¶ 87.1.) The parties dispute whether Plaintiff left DelGreco a voice message in October 2010 advising that she "would no longer be available to teach for a while." (Defs.' 56.1 Stmt. ¶ 88, Pl.'s 56.1 Counterstmt. ¶ 88.) Plaintiff alleges that she "never told anyone at the District that she was no longer available to substitute teach" and "never left a message on the substitute registry stating that she was no longer available to work at the District." (Pl.'s 56.1 Counterstmt. ¶¶ 88.1-88.2.)

Defendants allege that DelGreco contacted Plaintiff several more times but was not able to reach her, (Defs.' 56. Stmt. ¶ 89); however, Plaintiff disputes that allegation and avers that she did not receive phone calls from DelGreco regarding substitute teaching after November 2010, (Pl.'s 56.1 Counterstmt. ¶ 89.1). Defendants allege that DelGreco "inactivated," but did not remove, Plaintiff from the per diem substitute list. (Def.'s 56.1 Stmt. ¶ 90.) Plaintiff disputes that allegation and alleges that while her name appears typewritten on the 2010-2011 per diem substitute

spreadsheet, the 2011-2012 spreadsheet has her name handwritten next to the words "Unavailable for 2011-2012." (Pl.'s 56.1 Counterstmt. ¶¶ 90.1-90.2.) The parties dispute whether Pombonyo was involved in "inactivating" Plaintiff from the per diem substitute list. (Defs.' 56.1 Stmt. ¶ 91; Pl.'s 56.1 Counterstmt. ¶ 91.) However, the parties do not dispute that it was common to list per diem substitute teachers as inactive. (Defs.' 56.1 Stmt. ¶ 92.)

The parties dispute whether Plaintiff contacted DelGreco between October 2010 and June 2011. (Defs.' 56.1 Stmt. ¶ 95; Pl.'s 56.1 Counterstmt. ¶ 95.) On June 4, 2011, Plaintiff emailed DelGreco and stated: "I have not received a phone call about subbing since October. I wanted to touch base with you to let you know that I would like to continue to sub for this school district and would like to be placed on the sub list for the upcoming school year." (Defs.' 56.1 Stmt. ¶ 94.) Plaintiff alleges that she contacted the District in late June 2011 and inquired about available leave replacement, teacher aide, and per diem substitute positions. (Pl.'s 56.1 Counterstmt. ¶ 94.3.) Plaintiff avers that she was told to submit application materials, but after she submitted an application the District did not contact her regarding her "repeated requests" for positions for the 2011-2012 school year. (Pl.'s 56.1 Counterstmt. ¶ 94.4.)

Plaintiff alleges that in October 2012, DelGreco told her "I'm so happy you are back on the sub list. It broke my heart when she made me take you off." (Pl.'s 56.1 Counterstmt. ¶ 91.1.)

II. <u>2010 Bond Referendum</u>

In November 2010, the Board put forth a referendum regarding a proposed $5 million bond for capital improvements (the "Bond"). (Defs.' 56.1 Stmt. ¶ 100.) Plaintiff alleges the District retaliated against her because of her campaign against the Bond, which included distributing flyers, writing a letter to a newspaper, and a speech at a November 8, 2010 Board meeting. (Defs.' 56.1 Stmt. ¶ 105.) Plaintiff alleges that she opposed the Bond based on a December 2008 Audit Report indicating, among other things, that the District "consistently overestimated expenditures and underestimated revenues in their annual budgets." (Pl.'s 56.1 Counterstmt. ¶¶ 105.2, 105.7.)

Plaintiff avers that at the November 8, 2010 Board meeting, her husband, Jim Joinnides, spoke about the advantages of using an Energy Savings Company ("ESCO") to finance the District's capital improvements. (Pl.'s 56.1 Counterstmt. ¶ 106.1.) Plaintiff alleges that she spoke at the meeting about the benefits of ESCOs as well as her conversation with Peter Novak of the New York State Comptroller's Office. Plaintiff further alleges that when she stated she had Mr. Novak's number to provide to residents, "Dr. Pombonyo cut her off, stopped her from speaking, and began

yelling and screaming." (Pl.'s 56.1 Counterstmt. ¶¶ 106.2, 106.3, 106.5.)

On November 12, 2010, a letter written by Plaintiff and her husband appeared in the Floral Park Dispatch. (Pl.'s 56.1 Counterstmt. ¶ 107.1.) The Joinnides' letter urged voters to "vote down" the Bond referendum. (Pl.'s 56.1 Counterstmt. ¶ 107.2.) Plaintiff alleges that she opposed the Bond based on her belief that "the bond would unnecessarily pass costs along to the taxpayers, wherein there was a cost-neutral alternative for the funding of capital improvements." (Pl.'s 56.1 Counterstmt. ¶ 107.3.) The Bond was voted down on November 16, 2010. (Defs.' 56.1 Stmt. ¶ 109.)

## III. Citizens Budget Advisory Committee

In October 2011, the Board created an independent Citizens Budget Advisory Committee (the "CBAC") to receive input from the community regarding "difficult impending budgetary issues." (Defs.' 56.1 Stmt. ¶ 116.) Plaintiff was asked by Board member Denise DellaCorte to join the CBAC. (Defs.' 56.1 Stmt. ¶ 131.) Defendants allege that Plaintiff submitted a letter of interest to join the CBAC in October 2011. (Defs.' 56.1 Stmt. ¶ 130.) Plaintiff disputes that allegation and avers that she initially declined to join the CBAC because she was diagnosed with cancer in late August 2011, began chemotherapy in September 2011, and was facing surgery in January 2012. (Pl.'s 56.1 Counterstmt.

¶¶ 130.1-131.1.)  However, the parties do not dispute that Plaintiff interviewed for the CBAC in November 2011.  (Defs.' 56.1 Stmt. ¶ 135.)  Plaintiff alleges that during the interview, several Board members expressed concerns about her vocal opinions against the District.  In particular, Board Trustees Horan and Ferone said to Plaintiff, "you were very vocal about the bond issue.  What makes you think that we can trust you now?"  (Pl.'s 56.1 Counterstmt. ¶¶ 135.2-135.3.)  Nevertheless, the Board unanimously approved Plaintiff's application.  (Defs.' 56.1 Stmt. ¶ 136.)

The CBAC was comprised of "teachers, residents, two (2) administrators, and two (2) board members," and was "tasked to make a recommendation to the Board regarding the budget."  (Defs.' 56.1 Stmt. ¶¶ 119, 122.)  In particular, Pombonyo and Board members Laura Ferone and David Tsoupros were members of the CBAC.  (Defs.' 56.1 Stmt. ¶ 133.)  CBAC made a budget recommendation to the Board, which Plaintiff agreed to, in March 2012.  (Defs.' 56.1 Stmt. ¶¶ 124-25.)

Defendants allege that Plaintiff behaved in an "unprofessional and disruptive" manner during her tenure on the CBAC.  (Defs.' 56.1 Stmt. ¶ 137.)  Defendants allege that Plaintiff required that speakers repeat themselves, interrupted other CBAC members, and was rude to Pombonyo.  (Defs.' 56.1 Stmt. ¶¶ 130, 141, 151.)  Defendants aver that Plaintiff attempted to further her own agenda--particularly, the elimination of Schozer's

position--despite the CBAC's specific instruction not to discuss personnel decisions at meetings. (Defs.' 56.1 Stmt. ¶¶ 142-144, 148.) Defendants allege that multiple CBAC members "complained about Plaintiff's conduct and her vendetta against the Board and District." (Defs.' 56.1 Stmt. ¶ 152.) Defendants allege that Plaintiff authored numerous emails to CBAC chairperson Joe Pepe ("Pepe") that used expletives to describe the District, Board, and other CBAC members. (Defs.' 56.1 Stmt. ¶ 160.)

Plaintiff alleges that she attended three of the nine CBAC meetings and participated by speaker phone on two other occasions; during the meetings she did attend, Plaintiff was "very sick, sore, and weak." (Pl.'s 56.1 Counterstmt. ¶¶ 137.4-137.5.) Plaintiff concedes that she expressed strong opinions but alleges that she "did not act rudely, or disrespectfully towards any individuals while at CBAC meetings." (Pl.'s 56.1 Counterstmt. ¶ 137.7.) Plaintiff denies that she intentionally interrupted other CBAC members, and denies that she utilized CBAC to further her own agenda. (Pl.'s 56.1 Counterstmt. ¶¶ 137.10, 142.1.) Plaintiff alleges that she did not "consistently" advocate for the elimination of Schozer's position at CBAC meetings but concedes that she advocated for the elimination of the position of Assistant Superintendent for Curriculum and Instruction (which was held by Schozer) as a "cost savings measure to the District." (Pl.'s 56.1 Counterstmt. ¶¶ 144.1-44.2.) Plaintiff alleges that she

considered her emails to Pepe to be private emails to a friend, and avers that she did not use "crass language" during CBAC meetings. (Pl.'s 56.1 Counterstmt. ¶¶ 160.2-160.3.)

The parties dispute whether Pepe advised Plaintiff that she was "behaving erratically." (Defs.' 56.1 Stmt. ¶ 170; Pl.'s 56.1 Counterstmt. ¶¶ 170-170.1.) Defendants allege that Pepe recommended that the Board remove Plaintiff from CBAC; however, Plaintiff alleges that in May 2012, Pepe wrote an email that stated, among other things, "I do not want to lose you as a future member so please stay with this." (Defs.' 56.1 Stmt. ¶ 173; Pl.'s 56.1 Counterstmt. ¶ 173.1.) The parties do not dispute that the Board did not remove Plaintiff from CBAC, and that neither the Board nor the District "expressed any displeasure" regarding Plaintiff's suggestions or service on the CBAC. (Defs.' 56.1 Stmt. ¶¶ 174, 187-88.) On June 20, 2012, Plaintiff resigned from the CBAC. (Defs.' 56.1 Stmt. ¶ 189.)

IV. <u>2012-2013 Per Diem Substitute List</u>

In July 2012, Pombonyo retired and James Opiekun ("Opiekun") became the new District Superintendent. (Defs.' 56.1 Stmt. ¶¶ 191-92.) The parties do not dispute that Pombonyo and Opiekun did not discuss Plaintiff. (Defs.' 56.1 Stmt. ¶ 193.)

During the summer of 2012, Plaintiff contacted DelGreco and expressed interest in applying for the per diem Substitute List. (Defs.' 56.1 Stmt. ¶ 195.) DelGreco advised Plaintiff to

forward her resume and letter of interest to the District office. (Defs.' 56.1 Stmt. ¶ 196.)  Plaintiff applied for the Substitute List for the 2012-2013 school year.  (Defs.' 56.1 Stmt. ¶ 194.)

Substitute List applications are forwarded to the District office.  (Defs.' 56.1 Stmt. ¶ 202.)  School principals interview per diem substitute candidates and "sometimes" the Superintendent also conducted interviews.  (Defs.' 56.1 Stmt. ¶¶ 203-04.)  Candidates are then placed on the Board's agenda for formal approval; this formal approval by the Board is required for a teacher to be placed on the Substitute List.  (Defs.' 56.1 Stmt. ¶¶ 205-06.)  Since the relevant Board meeting does not take place until after the start of the school year, the Superintendent may appoint a substitute teacher prior to the Board meeting.  However, Board approval is required for that teacher to be placed on the Substitute List.  (Defs.' 56.1 Stmt. ¶ 207.)

In September 2012, the Board became aware that Plaintiff was substitute teaching without Board approval.  (Defs.' 56.1 Stmt. ¶ 208.)  Plaintiff alleges that she was contacted by DelGreco to substitute teach at the beginning of the school year and that she substitute taught at JLCS on approximately four occasions during September and October 2012.  (Pl.'s 56.1 Counterstmt. ¶¶ 208.1-208.2.)  Plaintiff alleges that in October 2012, Opiekun told DelGreco that she was no longer permitted to contact Plaintiff to substitute teach.  (Pl.'s 56.1 Counterstmt. ¶ 208.3.)

Ferone, a member of the Board,[3] advised Opiekun that "Plaintiff had been disruptive on the CBAC and other members threatened to resign due to her conduct." (Defs.' 56.1 Stmt. ¶ 210.) Ferone also advised Opiekun that the Board would need to discuss Plaintiff's candidacy. (Defs.' 56.1 Stmt. ¶ 211.) Horan, another member of the Board, asked Opiekun why Plaintiff was substitute teaching without Board approval. (Defs.' 56.1 Stmt. ¶ 212.) Assistant Superintendent Michael Fabiano ("Fabiano"), a CBAC administration member, advised that Plaintiff was "disruptive" during her tenure on the CBAC. (Defs.' 56.1 Stmt. ¶¶ 111, 214.) Plaintiff alleges that Fabiano told Opiekun that Plaintiff was "very critical" of the Board during her time on the CBAC. (Pl.'s 56.1 Counterstmt. ¶ 214.1.)

Defendants allege that during an October "workshop meeting," the Board advised Opiekun that it was not inclined to approve Plaintiff's application for the Substitute List based on her "inappropriate" behavior while on the CBAC. (Defs.' 56.1 Stmt. ¶¶ 215-16.) Plaintiff disputes that allegation and avers that Opiekun indicated during the October workshop that he was not placing Plaintiff on the list due to "some issues" and that the discussion about her would need to continue. (Pl.'s 56.1 Counterstmt. ¶ 216.1.)

---

[3] Defendants' 56.1 Statement states that Ferone was both "Board president" and "Trustee." (Defs.' 56.1 Stmt. ¶¶ 209-10.)

Plaintiff alleges that she met with Opiekun for approximately one hour prior to a second October Board meeting. (Pl.'s 56.1 Counterstmt. ¶¶ 217.1, 217.3.) Plaintiff alleges that during that meeting, she applauded Opiekun for posting his contract on the District website and "expressed criticism of the Board." (Pl.'s 56.1 Counterstmt. ¶¶ 217.2-217.3.) Plaintiff alleges that Opiekun advised her that the Board would not permit her to substitute teach and stated, "every school has an institutional memory, and this Board of Education seems to have a long institutional memory." (Pl.'s 56.1 Counterstmt. ¶ 217.5.) Plaintiff also avers that Opiekun expressed concerns that she would "blur the lines between a taxpayer and homeowner, and an employee of the District" and that if she saw something wrong, she would discuss it. (Pl.'s 56.1 Counterstmt. ¶ 217.6.) Nevertheless, Opiekun indicated that he would speak to the Board on Plaintiff's behalf. (Pl.'s 56.1 Counterstmt. ¶ 217.8.)

The Board discussed Plaintiff's candidacy at a subsequent October meeting. (Defs.' 56.1 Stmt. ¶ 217.) Ferone advised Opiekun that Plaintiff's behavior while on the CBAC was "dysfunctional, disruptive and erratic," and felt that she should not be in the classroom. (Defs.' 56.1 Stmt. ¶¶ 218-19.) Horan also expressed concerns regarding Plaintiff's conduct on the CBAC, citing her "disrespectful and disruptive presence." (Defs.' 56.1 Stmt. ¶¶ 220-21.) Tsoupros stated that if Plaintiff was permitted

to substitute teach, he wanted assurances that she would not be in the same class as his children. (Defs.' 56.1 Stmt. ¶ 222.) Defendants allege that certain Board members brought Plaintiff's emails containing expletives to Opiekun's attention. (Defs.' 56.1 Stmt. ¶ 223.) In the end, the Board unanimously advised Opiekun that Plaintiff would not be placed on the Substitute List. (Defs.' 56.1 Stmt. ¶ 224.) Opiekun did not recommend Plaintiff for the Substitute List. (Defs.' 56.1 Stmt. ¶ 228.)

Defendants allege that Plaintiff's opposition to the Bond was not considered by the Board with respect to her 2012 application for the Substitute List, and note that the same Board that denied Plaintiff's Substitute List application approved her application for the CBAC in 2011. (Defs.' 56.1 Stmt. ¶¶ 226-27.) However, Plaintiff disputes that allegation and avers that Board members discussed Plaintiff's opposition to the Bond with Opiekun. (Pl.'s 56.1 Counterstmt. ¶ 223.4.) Defendants allege that Plaintiff feels the Board did not recommend her for the per diem substitute teaching list "because they did not like her personally." (Defs.' 56.1 Stmt. ¶ 231.) Plaintiff alleges that the Board was opposed to her application based on her and her husband's opposition to the Bond and her criticism of Board positions and policies while a member of the CBAC. (Pl.'s 56.1 Counterstmt. ¶ 231.1.) Plaintiff concedes that she believes the Board did not like her personally, but believes this dislike was

based on her criticism of the Board. (Pl.'s 56.1 Counterstmt. ¶ 231.2.)

V.    <u>Defendants' Motion for Summary Judgment</u>

        Defendants argue that Plaintiff's First Amendment retaliation claims must be dismissed. (Defs.' Br., Docket Entry 63, at 9.) Defendants allege that Plaintiff cannot establish a <u>prima facie</u> retaliation case with respect to the District's alleged refusal to call her to substitute teach in 2010. (Defs.' Br. at 9.) Defendants argue that Plaintiff cannot demonstrate that she suffered an adverse employment action because Plaintiff left DelGreco a voicemail indicating that she was no longer available to substitute teach and stopped calling to request work. (Defs.' Br. at 9-10.) Defendants also argue that Plaintiff cannot establish that her speech was a motivating factor in any action because Plaintiff stopped receiving teaching assignments in October 2010, approximately one month before she engaged in allegedly protected speech in November 2010. (Defs.' Br. at 11.) Additionally, Defendants argue that Plaintiff cannot establish municipal liability pursuant to <u>Monell v. Dep't of Social Servs. of the City of N.Y.</u>, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978). (Defs.' Br. at 12-13.) Defendants aver that DelGreco was not a decision-maker and Plaintiff cannot demonstrate that Pombonyo possessed final policymaking authority with respect to the hiring of substitute teachers. (Defs.' Br. at 13.)

Defendants also argue that Plaintiff's retaliation claim regarding the denial of her application for the 2012-2013 per diem Substitute List must fail. (Defs.' Br. at 14.) Defendants allege that Plaintiff did not engage in protected speech, and argue that: (1) her November 2010 speech is too far removed from the 2012 denial of her application, and (2) her criticism of the Board while on the CBAC was personal, based on her "vendetta" against the Board or, alternatively, was made pursuant to her duties as a CBAC member. (Defs.' Br. at 14-18.) Additionally, Defendants argue the Board possessed a non-retaliatory basis for declining to hire Plaintiff--namely, her inappropriate behavior on the CBAC. (Defs.' Br. at 21.)

Plaintiff argues that she has stated claims for First Amendment retaliation. Plaintiff alleges that she suffered an adverse employment action based on the District's decision to remove her from the substitute list, decline to call her to substitute teach during the 2010-2011 school year, and decline to contact her about her applications for the 2011-2012 school year. (Pl.'s Br. at 7.) Plaintiff alleges that she never advised DelGreco or anyone at the District that she was unavailable to substitute teach and notes that "the District not only stopped calling Plaintiff to work, but actually removed her from the substitute roster." (Pl.'s Br. at 5-6 (emphasis in original).) Plaintiff avers that a causal connection between her speech and

these adverse actions is clear, as she was regularly called to substitute teach in September and October 2010 and the District ceased contacting her after she spoke out against the Bond in November 2010. (Pl.'s Br. at 7.) Plaintiff argues that Pombonyo was a policymaker under Monell and the record supports that Pombonyo directed DelGreco to take Plaintiff off of the substitute teacher list. (Pl.'s Br. at 9-10.)

Plaintiff also argues that she has stated a prima facie retaliation case with respect to the denial of her 2012 application for the Substitute List. (Pl.'s Br. at 11.) Plaintiff argues that, notwithstanding the temporal gap between her November 2010 opposition to the Bond and the 2012 denial of her application, she has established that the Board engaged in a "pattern of 'antagonism'" and Plaintiff's 2012 application was the Board's first opportunity to retaliate against her. (Pl.'s Br. at 11-12 (citation omitted).) Further, Plaintiff argues that her expression of "strong opinions" while a member of the CBAC constitute protected activities because they addressed matters of public concern; Plaintiff notes that even if her sole motivation for speaking out was to avenge her personal grievances with the Board, motive is not conclusive as to whether speech touched upon issues of public concern. (Pl.'s Br. at 13-16.) Additionally, Plaintiff alleges that she was not an employee of the District during her time on the CBAC. (Pl.'s Br. at 16-17.)

Plaintiff also argues that Defendants' justification for their failure to hire her is pretextual, as the record does not establish that the Board actually reviewed Plaintiff's allegedly profane emails prior to its determination. Plaintiff also disputes that she acted inappropriately while on the CBAC. (Pl.'s Br. at 18-21.) Plaintiff notes that her chemotherapy treatment and physical condition while on the CBAC belies the notion that she was an "abusive presence." (Pl.'s Br. at 21.) Plaintiff argues that Opiekun's admission that Board members advised him that Plaintiff had been "very critical" while on the CBAC and his statement that the Board has a "long institutional memory" provides direct evidence of retaliatory intent. (Pl.'s Br. at 24.)

DISCUSSION

I. <u>Legal Standard</u>

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate, the Court considers the pleadings, deposition testimony, interrogatory responses, and admissions on file, together with

other firsthand information that includes but is not limited to affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

A plaintiff will overcome summary judgment on a First Amendment retaliation claim in connection with public employment where she presents evidence demonstrating: "(1) that the speech at issue was protected, (2) that [s]he suffered an adverse employment action, and (3) that there was a causal connection between the protected speech and the adverse employment action." Nagle v. Marron, 663 F.3d 100, 105 (2d Cir. 2011) (internal quotation marks

and citations omitted).  The defendant can overcome such a showing by establishing "by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct."  Id. (internal quotation marks and citations omitted)

## II.  2010 Refusal to Contact Plaintiff to Substitute Teach

Defendants do not dispute that Plaintiff engaged in protected speech when she spoke out against the Bond in November 2010.  (See generally Defs.' Br. at 9-12.)  As previously noted, Defendants argue that Plaintiff "cannot establish that either she suffered an adverse employment action or that her speech was a motivating factor behind any action."  (Defs.' Br. at 9.)  The Court disagrees.

At the outset, the Court notes that Plaintiff alleges she suffered the following adverse employment actions subsequent to her November 2010 protected speech: (1) removal from the substitute list; (2) failure to be contacted to substitute teach for the remainder of the 2010-2011 school year; and (3) failure to be contacted regarding her applications for positions for the 2011-2012 school year.  (Pl.'s Br. at 7.)  Defendants argue that Plaintiff's second and third alleged adverse employment actions constitute new claims that cannot be raised for the first time in connection with a summary judgment motion.  (Defs.' Reply Br., Docket Entry 72, at 2-3.)

The Court finds that Plaintiff's allegation that the District failed to call her for the remainder of the 2010-2011 school year is simply another way of stating that she was allegedly removed from the substitute teacher list. The Amended Complaint alleges that Defendants retaliated against Plaintiff by removing her from the Substitute List. (Am. Compl., Docket Entry 36, ¶ 74.) The consequence of removal from the Substitute List was that the District ceased calling Plaintiff regarding substitute teaching opportunities. Thus, the allegation that Plaintiff was not contacted for the remainder of year is merely an elaboration of her argument that she was removed from the substitute list.

Conversely, while Plaintiff now alleges that Defendants' failure to hire her for the 2011-2012 school year constitutes an adverse employment action, that allegation does not appear in the Amended Complaint. (See generally Am. Compl.) As Plaintiff is not permitted to assert a new theory of liability in opposition to a summary judgment motion, Ahmad v. Port Authority of N.Y. and N.J., No. 09-CV-3134, 2011 WL 7080691, at *6 (E.D.N.Y. Dec. 7, 2011), report and recommendation adopted, 2012 WL 194965 (E.D.N.Y. Jan. 23, 2012) (collecting cases), and she has not moved to amend the Amended Complaint, the Court will not consider whether her failure to be hired for the 2011-2012 school year constitutes an adverse employment action.

The parties do not dispute that the District stopped calling Plaintiff to substitute teach. However, the District alleges that Plaintiff declined a full-time leave replacement position due to her part-time job at the Museum and left DelGreco a voice message stating that she was not available to substitute teach. (Defs.' Br. at 9-10.) In support, Defendants cite to DelGreco's deposition, in which she testifies that in October 2010, Plaintiff left a message on the substitute registry answering machine "that she would not be available for a while." (DelGreco Dep. Tr., Defs.' Ex. F, Docket Entry 58-6, 32:13-33-7.) DelGreco also testified that since Plaintiff's alleged message was "open ended with[out] a specific end date," she attempted to reach out to Plaintiff by either leaving messages or hanging up if Plaintiff did not answer the phone. (DelGreco Dep. Tr. 39:7-40:18.) Defendants also note that DelGreco testified that: (1) Plaintiff stopped calling even though her prior practice had been to contact DelGreco to request work, and (2) the first time Plaintiff requested work was pursuant to an email sent in June 2011. (DelGreco Dep. Tr. 69:8-72:2.) DelGreco also stated that she made a notation on the substitute list regarding Plaintiff's unavailability. (DelGreco Dep. Tr. 32:4-12.) Indeed, the 2010-2011 substitute teacher list states "Oct. no longer avail" under Plaintiff's name and the 2011-2012 substitute teacher list

contains a handwritten note stating "Mrs. Joinnides unavailable for 2011/12." (Pl.'s Ex. X, Docket Entry 64-24, at 4.)

However, Plaintiff expressly denies that she ever advised DelGreco that she was unavailable to substitute teach. (Pl.'s Dep. Tr., Pl.'s Ex. B, Docket Entry 64-2, 130:8-15; see also Pl.'s Decl., Docket Entry 65, ¶ 5 ("I never, in the Fall of 2010 or at any time, left a voice message on the District's substitute registry stating that I was unavailable to work at the District").) Plaintiff also alleges that in the Fall of 2012, DelGreco said to her, "I'm so happy you're back on the sub list. It broke my heart when she made me take you off."[4] (Pl.'s Dep. Tr. 133:19-24; but see DelGreco Dep. Tr., 68:16-21 ("Q. Did you ever tell Miss Joinnides that it broke your heart when Dr. Pombonyo made you take her off the sub list . . . A. I don't remember ever saying it.").) Plaintiff alleges that she "assume[s]" DelGreco was referring to Pombonyo. (Pl.'s Dep. Tr. 137:20-138:6.)[5]

---

[4] Defendants do not argue that Plaintiff's testimony regarding DelGreco's alleged statement constitutes inadmissible hearsay. However, the Court notes that this testimony would be admissible as a statement by an opposing party pursuant to Federal Rule of Evidence 802(d)(2)(D). See Fed. R. Evid. 802(d)(2)(D) (A statement is not hearsay where it is "offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]").

[5] Defendants appear to argue that DelGreco's alleged statement was made in 2012 and, notwithstanding DelGreco's denial of even making that statement, DelGreco would have been referring to Plaintiff's absence from the 2011-2012 list due to her illness,

Accordingly, there are clear issues of fact regarding whether Plaintiff left DelGreco a voice message indicating that she was no longer available to substitute teach.  While Defendants make great hay of Plaintiff's deposition testimony that in December 2010 she either "did not consider herself to be an employee of the District" or "she did not know whether she was an employee of the District," (Defs.' Br. at 10), the Court is not persuaded.  When asked whether she was an employee of the District in December of 2010, Plaintiff testified that she was not an employee because she "hadn't been called to sub for quite a while--for quite a few months, so not really, no." (Pl.'s Dep. Tr. 141:16-21.)  Plaintiff also indicated that she did not consider herself to be an employee because a per diem substitute teacher was analogous to a "contractual worker." (Pl.'s Dep. Tr. 142:6-12.)  Plaintiff also testified that she was "uncertain" whether she was an employee as of December 2010 "because I hadn't been called to sub for a while." (Pl.'s Dep. Tr. 278:18-24.)  Contrary to Defendants' argument, this testimony does not establish that Plaintiff voluntarily resigned as a substitute teacher.  (See Defs.' Br. at 10-11.)

Defendants also argue that Plaintiff cannot establish causation because the alleged adverse action began in October 2010,

---

not her alleged unavailability during the 2010-2011 year. (Defs.' Reply Br. at 2.)  This alternative interpretation simply adds another layer to the parties' factual dispute.

one month before Plaintiff engaged in protected speech in November 2010. (Defs.' Reply Br. at 4.) The record is not clear as to the last date that Plaintiff was called to substitute teach in the fall of 2010. When asked how many times per week she substitute taught in August, September, and October of 2010, Plaintiff stated: "None in August because there is no school but September, October and November, I don't recall how many times a week. It was a lot." (Pl.'s Dep. Tr. 126:11-17.) However, Plaintiff also somewhat inconsistently testified that "I was quite confused why I had not been called and you have in your possession of e-mails I wrote to [DelGreco] I haven't been called since October or November to sub." (Pl.'s Dep. Tr. 132:20-25.) Nevertheless, Defendants have not proffered any evidence that they stopped calling Plaintiff to substitute teach in October 2010--prior to her protected speech-- aside from DelGreco's disputed testimony and the notation on the substitute roster for the 2010-2011 school year.

The Court finds that Plaintiff has stated a prima facie case of retaliation. Putting aside the disputed issue of the voice message, Plaintiff alleges that the District contacted her to substitute teach in September and October 2010, and the District stopped calling her to substitute teach following her undisputedly protected speech in November 2010. (Pl.'s Br. at 7.) Thus, temporal proximity supports Plaintiff's retaliation claim. See Pitton v. N.Y. City Dep't of Educ., --- F.3d ---, 2015 WL 7776908,

at *9 (E.D.N.Y. 2015) ("a plaintiff may establish causation indirectly by showing her speech was followed closely in time by the adverse employment action.") (citation omitted). Plaintiff has also alleged that during the Board meeting when she spoke out against the Bond, Pombonyo "stopped me and began yelling and screaming . . . [s]he didn't allow me to speak freely." (Pl.'s Dep. Tr. 160:5-11.) Moreover, it is undisputed that the Board supported the passage of the Bond, while Plaintiff vocally opposed it. (Defs.' 56.1 Stmt. ¶¶ 106, 108.) Thus, Plaintiff has demonstrated that her November 2010 speech "'was a substantial motivating factor in the adverse employment action.'" Pitton, 2015 WL 7776908, at *9 (quoting Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 167 (2d Cir. 2006)). The Court finds that a reasonable juror may conclude that Defendants retaliated against Plaintiff for her November 2010 protected speech by removing her from the Substitute List.

Parenthetically, Defendants do not allege that they still would have ceased contacting Plaintiff to substitute teach in the absence of her protected speech. Instead, Defendants rely solely on their argument that the protected activity post-dates the alleged adverse action. (See generally Defs.' Br. at 9-14.) As addressed above, there are issues of fact as to when Defendants stopped contacting Plaintiff to substitute teach.

A.  Section 1983 Liability

School districts constitute "persons" pursuant to Section 1983; however, they cannot be held liable on a theory of respondeat superior and are only liable "if [their] 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"  Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 128 (2d Cir. 2004) (quoting Monell, 436 U.S. at 694, 98 S. Ct. at 2037-38).  An official's choices constitute government policy where he "'has final authority over significant matters involving the exercise of discretion.'"  Kregler v. City of N.Y., 987 F. Supp. 2d 357, 361-62 (S.D.N.Y. 2013), aff'd, 604 F. App'x 44, (2d Cir. 2015) (quoting Clue v. Johnson, 179 F.3d 57, 62 (2d Cir. 1999)).  Thus, municipal liability may be appropriate in connection with the single decision of a policymaker.  Id. (citation omitted).  State law governs whether an official possesses final policymaking authority.  Nagle, 663 F.3d at 116.

The question of whether an official is a final policymaker is a matter of law to be determined prior to the submission of the case to the jury.  T.E. v. Pine Bush Cent. Sch. Dist., 58 F. Supp. 3d 332, 372 (S.D.N.Y. 2014) (citing Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).  "'[T]he critical inquiry is not whether an official generally has final policymaking authority . . . [but] whether the government official is a final

policymaker with respect to the particular conduct challenged in the lawsuit.'" Pine Bush, 58 F. Supp. 3d at 372 (quoting Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008); first alteration in original).

The parties do not dispute that DelGreco is not a policymaker. Instead, Plaintiff argues that Superintendent Pombonyo is a policymaker with respect to the decision to remove Plaintiff from the substitute teacher list. (Pl.'s Br. at 9.)

To the extent that Defendants' motion can be construed as asserting that Pombonyo cannot be a policymaker based on her position as Superintendent, the Court disagrees. (See Defs.' Br. at 13-14 ("In other words, the Superintendent, at best, is to carry out the policy of the board, not to create the policy").) Courts in this Circuit have held that a school Superintendent may be a Monell policymaker. See, e.g., Nagle, 663 F.3d at 116 (Holding that where the superintendent's recommendation was required for an applicant to obtain school board approval, the superintendent may be a "final decisionmaker with respect to personnel appointments, because his recommendations are essentially those of the governmental body.") (internal quotation marks and citation omitted); Konits v. Valley Stream Cent. High Sch., No. 01-CV-6763, 2006 WL 224188, at *5 (E.D.N.Y. Jan. 28, 2006) (Holding that the superintendent was a policymaker for purposes of hiring teachers). Thus, Plaintiff "must show that [Pombonyo] had final policymaking

power." <u>Pine Bush</u>, 58 F. Supp. 3d at 372 (internal quotation marks and citation omitted).

While Defendants correctly note that the express powers proscribed to school superintendents by the New York Education Law do not include the power to terminate teachers, (<u>see</u> Defs.' Br. at 13-14 (citing N.Y. Education Law §§ 2509(1), 2508),[6] here, Plaintiff technically was not terminated. The District did not formally terminate Plaintiff as a per diem substitute teacher; it merely effectively removed Plaintiff from the Substitute List and ceased calling her regarding substitute teaching opportunities.

The applicable provisions of the Education Law addressing the powers and duties of superintendents and school boards of Union Free School Districts do not reference the management or selection of substitute teachers. <u>See</u> N.Y. Education Law §§ 1709, 1711. However, Section 1709 provides that the Board shall "have in all respects the superintendence, management and control of the educational affairs of the district and therefore shall have all the powers reasonably necessary to . . . discharge

---

[6] Defendants cite provisions of the New York Education Law that apply to city school districts with less than 125,000 residents. <u>See</u> N.Y. Education Law §§ 2508, 2509(1)(a). However, as the District is a Union Free School District, Article 35 of the Education Law contains the provisions applicable to the case at bar. Nevertheless, New York Education Law § 1711, which governs superintendents of Union Free School Districts, also does not expressly provide a superintendent with the ability to terminate teachers.

duties imposed expressly or by implication by this chapter or other statutes." N.Y. Education Law § 1709(33). Additionally, the Superintendent of a Union Free School District is charged with "enforce[ing] all provisions of law and all rules and regulations related to the management of the schools . . . under the direction of the board of education." N.Y. Education Law § 1711(2)(b). Thus, the question becomes whether the Board "discharge[d]" the duty to assign substitute teachers to Pombonyo as District Superintendent.

Courts in this Circuit are somewhat divided as to when a school official qualifies as a final policymaker. See Pine Bush, 58 F. Supp. 3d at 373-74 (Noting that "courts in the Second Circuit are split as to whether a principal may qualify as a final policymaker for purposes of Monell liability.") (collecting cases). However, district courts in this Circuit have held that a school principal is a final policymaker where "the ultimate harm that befell the plaintiff was under the principal's control." Zambrano-Lamhaouhi v. N.Y. City Bd. of Educ., 866 F. Supp. 2d 147, 175 (E.D.N.Y. 2011). Cf. Rabideau v. Beekmantown Cent. Sch. Dist., 89 F. Supp. 2d 263, 268 (N.D.N.Y. 2000) ("the legislature only intended to impose upon the board of education general duties relating to generally setting up and maintaining the educational system . . . [it] did not intend to impose upon the board of education a duty to make and assume direct responsibility of

31

enforcing rules reaching down into each classroom in the school system"). Conversely, "[w]here the final authority for a particular matter is not within the principal's control or is subject to review by another official or entity, the principal is not the final policymaker with respect to that matter." Eldridge v. Rochester City Sch. Dist., 968 F. Supp. 2d 546, 562 (W.D.N.Y. 2013). The Court finds that these principles are equally applicable to the analysis of whether a superintendent is a final policymaker.

Pombonyo testified that she was DelGreco's direct supervisor. (Pombonyo Dep. Tr., Defs.' Ex. D, Docket Entry 58-4, 25:20-26:6.) When asked whether DelGreco generally told her when a substitute teacher advised that he or she no longer wished to be contacted, Pombonyo responded:

> A. Not always at the time. What I will do with Mrs. DelGreco on a daily basis is who's absent, who's covering for them. I would look over kind of over a week if we had a teacher absence for three days, kind of a quality control check on our subbing, are we getting the same sub and have continuity in class. Very often if I had heard a teacher was going to be out for not even really a leave, say, five days because they were ill or whatever, very often I would make a suggestion of a sub.
>
> So at those times I was discussing the status of our substitute teacher program with [DelGreco] and very often she would update me and those discussions took place roughly weekly. So yes, I would hear because she would tell me oh, so and so got a job here or there

32

or so and so is out sick or so and so is on
vacation.

(Pombonyo Dep. Tr. 130:4-131:8.)

The Court finds that Pombonyo is a final policymaker
with respect to the assignment of substitute teachers.  To the
extent that Plaintiff can establish that the District ceased
calling her to substitute teach in retaliation for her protected
speech, the ultimate harm to Plaintiff--the loss of substitute
teaching opportunities--was under Pombonyo's control.  As noted,
Pombonyo was DelGreco's direct supervisor and admittedly reviewed
with DelGreco "on a daily basis" which substitute teachers were
covering for absent teachers.  Moreover, by Pombonyo's own account,
DelGreco would update Pombonyo approximately every week as to "the
status of [the] substitute teacher program."  (Pombonyo Dep. Tr.
130:24-131:4.)  There is no indication that the determination as
to which substitute teachers were called to teach during any given
week were subject to Board approval or that the Board was involved
in any way, shape, or form, in the scheduling of the District's
substitute teachers.  Cf. Jeffes, 208 F.3d at 61 (Holding that the
sheriff was a policymaker regarding his staff's conduct toward
officers speaking out about wrongdoing where there was no
"provision of State or local law that requires a sheriff to answer
to any other entity in the management of his jail staff with
respect to the existence or enforcement of a code of silence.").

To be clear, the conduct at issue with respect to Pombonyo's policymaking authority is substitute teacher scheduling, not hiring. The Court makes no determination as to whether Pombonyo is a policymaker with respect to hiring substitute teachers.

The Court acknowledges that Pombonyo denied discussing Plaintiff with DelGreco in connection with the 2011-2012 substitute list, (Pombonyo Dep. Tr. 134:8-11), and that DelGreco denied discussing which substitute teachers to choose on particular days with Pombonyo (DelGreco Dep. Tr. 23:6-9). As previously noted, DelGreco also denied that Pombonyo "made" her remove Plaintiff from the substitute teacher list. (DelGreco Dep. Tr. 38:22-25.) However, the Court finds that a reasonable juror could determine that Pombonyo directed DelGreco to remove Plaintiff from the substitute teacher list based on Pombonyo's discussions with DelGreco regarding substitute teacher scheduling and Pombonyo's allegedly heated exchange with Plaintiff at the November 2010 Board meeting. Plaintiff argues that the fact her name appears handwritten on the 2011-2012 Substitute List with a notation that she is unavailable indicates that "at some point after Plaintiff's speech [DelGreco] manually removed Plaintiff's name from the list at the direction of Dr. Pombonyo." (Pl.'s Br. at 6.) While ambiguous and disputed, Plaintiff's allegation regarding DelGreco's comment that it "broke her heart" to remove

Plaintiff from the Substitute List also lends support to Plaintiff's argument.

Accordingly, Defendants' motion for summary judgment is DENIED with respect to her retaliation claim regarding the District's refusal to contact her regarding substitute teaching work during the 2010-2011 school year.

## III. 2012 Denial of Per Diem Substitute Teacher Application

Plaintiff asserts two theories with respect to her claim of retaliation regarding the District's refusal to hire her for the 2012-2013 per diem substitute teacher position. Particularly, Plaintiff argues that Defendants retaliated against her in 2012 based on: (1) her November 2010 opposition to the bond, and (2) the strong opinions she expressed while a member of the CBAC during 2011. (See Pl.'s Br. at 11, 13.) The Court will address each theory in turn.

### A. Retaliation Based on Bond Opposition

Defendants argue that the approximately two year gap between Plaintiff's November 2010 speech and the District's 2012 refusal to hire her for the per diem substitute position is too attenuated to establish causation. (Defs.' Br. at 14.) The Court concurs that two years is too long of a time frame to establish causation based on temporal proximity alone. See McGuire v. Warren, No. 05-CV-2632, 2009 WL 3963941, at *12 (S.D.N.Y. Nov. 18, 2009) (Noting that courts in this Circuit have declined to find a

causal relationship based on a more than two-month gap where temporal proximity is the only evidence offered in support of causation.). Additionally, the Court is not persuaded by Plaintiff's argument that Defendants' "first opportunity to retaliate against [Plaintiff] with respect to her employment status was when she applied for the [substitute] position in Fall of 2012." (Pl.'s Br. at 11 (emphasis omitted).) That assertion is wholly inconsistent with Plaintiff's argument that Defendants retaliated against her by effectively removing her from the substitute list in November 2010, (see generally Pl.'s Br. at 3-8) and Plaintiff's allegation that beginning in late June 2011, Defendants failed to respond to her repeated inquiries about available positions (Pl.'s 56.1 Counterstmt. ¶¶ 94.3-94.4).

However, Plaintiff does not solely rely on temporal proximity; she also alleges that her retaliation claim is supported by direct evidence of retaliatory intent as well as Defendants' "pattern of antagonism." (Pl.'s Br. at 11-12 (internal quotation marks and citation omitted).) The Court agrees and finds that Plaintiff has stated a prima facie retaliation claim based on the theory that Defendants retaliated against her in 2012 for her November 2010 protected speech.

Plaintiff alleges that the following actions and/or incidents establish direct evidence of Defendants' retaliatory motive: (1) the Board's November 2010 letter responding to

Plaintiff's husband's opposition to the Bond; (2) October 2011 comments by certain Board members that Plaintiff "could not be trusted" based on her prior opposition to the Bond; (3) Opiekun's admission that he was advised about Plaintiff's opposition to the Bond; and (4) Opiekun's comment regarding the Board's "institutional memory." (Pl.'s Br. at 12-13.)

The Board's November 2010 letter is not highly probative of retaliatory intent because it was published approximately two years prior to the 2012 refusal to hire. Similarly, the Board members' alleged statement that Plaintiff "could not be trusted" was expressed in the context of opposing her appointment to the CBAC, not her inclusion on the 2012 substitute teacher list. (Pl.'s 56.1 Counterstmt. ¶ 167.2.) However, a reasonable juror could determine that Plaintiff's allegations regarding Opiekun support a finding of retaliatory motive on the part of the Board. Opiekun testified that in July 2012, he was advised by Assistant Superintendent Fabiano that Plaintiff had taken a position contrary to the Board's with respect to the Bond. (Opiekun Dep. Tr., Pl.'s Ex. E, Docket Entry 64-5, 93:12-95:11.) In October 2012, Plaintiff also advised Opiekun of her prior opposition to the Bond. (Opiekun Dep. Tr. 95:5-11.) Opiekun further testified that during this October 2012 meeting with Plaintiff, he said "[e]very district has an institutional memory"; Opiekun clarified that in using the phrase "institutional memory" he was referring

to "the sum total traditions and culture of a district . . . a sum total of the experience that a district has." (Opiekun Dep. Tr. 65:3-67:8.) Plaintiff alleges that Opiekun stated, "every school has an institutional memory, and this Board of Education seems to have a long institutional memory." (Pl.'s 56.1 Counterstmt. ¶ 217.5.)

The Court acknowledges that Opiekun also testified that the Board did not discuss Plaintiff's opposition to the Bond with him during September or October 2012, and that the Board's discussions regarding Plaintiff's application for the Substitute List largely centered on her behavior while on the CBAC. (Opiekun Dep. Tr. 74:13-76:15, 99:2-7.) Indeed, Defendants have also submitted an affidavit from Ferone in which she asserts that the Board did not consider Plaintiff's opposition to the Bond in relation to her 2012 Substitute List application. (Ferone Aff., Docket Entry 59, ¶ 39.) However, at the summary judgment stage, the Court is tasked with "issue finding, not issue determination." Copenhagen Reinsurance Co. (UK) Ltd. v. Sargeant Marine, Inc., No. 98-CV-1479, 1999 WL 173568, at *1 (S.D.N.Y. Mar. 29, 1999). See also Nagle, 663 F.3d at 105 (Noting that at the summary judgment stage, courts do not "weigh evidence.").

Additionally, "where, as here, there is evidence that the defendant engaged in an ongoing course of adverse action against the plaintiff, such action may serve as additional evidence

of retaliatory intent." <u>Tomlins v. Vill. of Wappinger Falls Zoning</u> <u>Bd. of Appeals</u>, 812 F. Supp. 2d 357, 375 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). As previously noted, Plaintiff alleges that in 2010, Defendants removed her from the substitute list and in 2011, Defendants refused to respond to her inquiries regarding available positions. While Defendants argue that any allegation of a pattern of adverse action is belied by both the Board's unanimous appointment of Plaintiff to the CBAC as well as the fact that the Board had no involvement in Plaintiff's removal from the Substitute List in 2010, (Defs.' Reply Br. at 7-8), the Court finds that Plaintiff has raised issues of fact regarding Defendants' alleged ongoing adverse conduct.

Defendants argue that they would have declined to hire Plaintiff regardless of her opposition to the Bond because "her behavior as a member of the CBAC was so erratic that it called into question her fitness to serve as a substitute." (Defs.' Br. at 21.) However, the parties have proffered vastly different accounts of Plaintiff's conduct while on the CBAC and this issue is rife with factual disputes. While Plaintiff alleges that she only physically attended three CBAC meetings and when she did, she was "very sick, sore, and weak" due to her medical condition, (Pl.'s 56.1 Counterstmt. ¶ 137.4), Defendants aver that Plaintiff was "unprofessional and disruptive" and sought to further her own personal agenda (Defs.' 56.1 Stmt. ¶¶ 137, 142-144).

Additionally, the Court is not persuaded by Defendants' argument that the Board possessed a "good-faith belief that plaintiff's behavior was erratic and inappropriate and demonstrated a profound lack of judgment . . . ." (Defs.' Br. at 23.)  First, the notion that the Board was "told from numerous sources" about Plaintiff's allegedly inappropriate conduct on the CBAC is somewhat disingenuous considering that two Board members, Tsoupros and Ferone, were also members of the CBAC with Plaintiff. (Ferone Aff. ¶ 19.)  As noted by Plaintiff, to the extent that Plaintiff establishes that she did not behave inappropriately while on the CBAC, Tsoupros and Ferone would have "had direct knowledge that Plaintiff never engaged [in] the behavior which they later deemed 'disruptive,' because they were actually present." (Pl.'s Br. at 23.)

Second, the parties dispute whether the Board was privy to Plaintiff's allegedly profane emails to Pepe prior to their determination regarding her 2012 substitute teacher application. (See Pl.'s Br. at 19; Defs.' Br. at 21.)  In support of the notion that the Board reviewed Plaintiff's emails, Defendants cite to a portion of Opiekun's deposition that is speculative, at best.  When asked whether the Board reviewed Plaintiff's emails prior to their second October 2012 meeting, Opiekun stated, "I'm assuming they did because they spoke about that as the negative interactions with the committee." (Opiekun Dep. Tr. 97:19-25.)  Defendants

also reference Plaintiff's June 2, 2012 email to Pepe in which she alleges: "I did not ask you to share the past few email regarding this issue with the committee but somehow they were shared, starting a firestorm of activity and dialogue." (Defs.' Ex. BB, Docket Entry 58-28.) While Defendants allege that this establishes that Ferone, Tsoupros, and Fabiano received Plaintiff's emails, the Court disagrees. (Defs.' Reply Br. at 12.) Plaintiff's June 2nd email does not indicate which CBAC members she believes received her emails, nor does it indicate which particular emails they received or the content of those emails.

Summary judgment is inappropriate where questions regarding the defendant's motive "predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." Nagle, 663 F.3d at 113 (internal quotation marks and citation omitted). Accordingly, Defendants' motion for summary judgment is DENIED with respect to Plaintiff's claim that Defendants retaliated against her by denying her 2012 substitute teacher application based on her November 2010 protected speech.

B. Retaliation Based on CBAC Activities

The parties appear to dispute whether Plaintiff's membership on the CBAC rendered her a public employee for purposes of the Court's analysis of whether Defendants retaliated against her for her criticism of the Board while a CBAC member. (See

41

Defs.' Br. at 18-20; Pl.'s Br. at 16-17.) Although Plaintiff's
CBAC membership was essentially an unpaid, volunteer position,
Defendants note that courts in this Circuit have considered civic
volunteers to be public employees in the context of First Amendment
retaliation claims. (Defs.' Reply Br. at 8-10.) See, e.g.,
Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty., 252
F.3d 545 (2d Cir. 2001) (Affirming the district court's analysis
of First Amendment retaliation claims brought by volunteers at a
government agency's 4-H program as claims by public employees.);
Langton v. Town of Chester, --- F. Supp. 3d. ---, 2016 WL 839052,
at *4 (S.D.N.Y. 2016) (Analyzing library volunteer's First
Amendment retaliation claims under framework applicable to public
employees.); Monz v. Rocky Point Fire Dist., 853 F. Supp. 2d 277,
284-85 (E.D.N.Y. 2012), aff'd, 519 F. App'x 724 (2d Cir. 2013)
(Analyzing volunteer firefighter's First Amendment retaliation
claims as claims brought by a public employee.). This Court
similarly finds that the framework applicable to public employees
governs Plaintiff's First Amendment retaliation claim based on
speech made during her tenure on the CBAC.

 The constitutional protections afforded to a public
employee's speech are guided by two inquiries. First, the Court
"determine[s] whether the employee spoke as a citizen on a matter
of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418, 126
S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006). If the answer is no,

the employee's First Amendment claim must fail.  If the answer is yes, the Court asks "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  Id.

Where public employees speak pursuant to their official duties, they "are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Id. at 421.  As there is no "brightline rule" as to whether a public employee's speech is made pursuant to her official duties, "[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two."  Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012) (citing Weintraub v. Bd. of Educ., 593 F.3d 196, 208 (2d Cir. 2010) (Noting that the determination of whether speech is made pursuant to official duties "necessitates a 'practical' inquiry into [the] plaintiff's job duties.")).  The Court may consider whether an employee's complaint was also expressed to the public.  Ross, 693 F.3d at 306.

Langton is instructive with respect to the Court's determination of this issue.  See Langton, 2016 WL 839052.  In that matter, a volunteer trustee of the town's library board alleged, inter alia, that the town retaliated against her in contravention of the First Amendment because she complained about the "the library's heating systems; mishandling of library funds;

43

nepotism; and inadequacy of library staff . . . ." Id. at *5
(internal citations omitted). In light of the fact that the
plaintiff, as a trustee, was required to "oversee[ ] the
functioning and management of the library," the Southern District
held that her statements were "precisely the[ ] type of critiques
and analyses that Plaintiff was charged with generating as a
library trustee." Id. As a result, the Court dismissed the
trustee's retaliation claim and found that her speech was not
protected, as it was "'part-and-parcel' of her job function as a
trustee." Id. (citation omitted).

        Here, the parties do not dispute that the CBAC was formed
by the Board "for the purpose of receiving input from the community
as a whole in connection with difficult impending budgetary
issues." (Defs.' 56.1 Stmt. ¶ 116.) Plaintiff testified that
CBAC's "mission was to bring forth concerns of other citizens and
taxpayers of Floral Park." (Pl.'s Sec. Dep. Tr., Docket Entry 58-
35, 33:21-34:4.) The parties also do not dispute that the CBAC
was tasked with discussing specific issues that included
"reviewing capital improvements and discussion of a potential
bond" and "attempting to exceed the property tax cap in formulating
the budget." (Defs.' 56.1 Stmt. ¶ 120.) Additionally, in March

2012, the CBAC made budget recommendations to the Board.[7] (Defs.'
56.1 Stmt. ¶ 124.)

Plaintiff alleges that while on the CBAC, she expressed
"strong opinions" and "openly criticized Board policies that she
felt were not in the best interests of community residents,
including the consistent overestimation of budget expenditures,
and the mismanagement of financial resources." (Pl.'s Br. at 13-
14.) In light of the fact that Plaintiff's "job" as a member of
the CBAC was to convey community concerns, discuss financial issues
affecting the District, and proffer a budgetary recommendation to
the Board, the Court finds that, like the trustee in Langton,
Plaintiff's expression of her opinions during CBAC meetings was
"part-and-parcel" of her duties as a CBAC member and accordingly,
do not constitute protected speech. Parenthetically, the record
does not indicate that Plaintiff publicized her criticism of the
Board during her tenure on the CBAC.

The Court notes that Plaintiff does not argue that her
emails to Pepe, a fellow CBAC board member, qualify as protected

---

[7] The Court notes that Defendants' citation for this allegation
is to "Exhibit OO," a document that was not included with its
motion for summary judgment. (See Defs.' 56.1 Stmt. ¶ 124.)
However, Plaintiff does not dispute that the CBAC presented a
budget recommendation to the Board. (Pl.'s 56.1 Countersmt.
¶ 124.)

speech.[8]  As previously noted, Plaintiff disputes that these emails were forwarded to the Board before it rendered a determination regarding her 2012 application for the Substitute List.  (Pl.'s Br. at 19.)  In any event, the Court finds that Plaintiff's emails to Pepe functioned as an extension of her CBAC discussions. Notwithstanding the expletives used in certain exchanges, Plaintiff's emails address her thoughts and opinions on the District's financial issues.  (See generally Defs.' Mot. Exs. W-BB.)

Accordingly, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claim that Defendants retaliated against her based on her speech while on the CBAC.  As Plaintiff did not speak as a "citizen," the Court need not determine whether she was speaking with respect to a matter of public concern.  See Langton, 2016 WL 839052, at *5.

## CONCLUSION

For the forgoing reasons, Defendants' motion for summary judgment (Docket Entry 28) is GRANTED IN PART AND DENIED IN PART.

---

[8] The Court notes that in addition to Plaintiff's email exchanges with Pepe, Defendants also submitted one June 2012 email exchange between Plaintiff and CBAC member Glen Rettinger and/or his wife.  (See Defs.' Ex. KK, Docket Entry 58-37; Pl.'s Br. at 19, n.3.)  Plaintiff alleges that this email exchange was provided to Defendants in July 2015 during discovery in this matter and, thus, the Board could not have reviewed these emails in connection with their 2012 denial of Plaintiff's application for the Substitute List.  (Pl.'s Br. at 19, n.3.)

Defendants' motion is DENIED with respect to Plaintiff's claims that Defendants retaliated against her based on her November 2010 speech by removing her from the 2010-2011 Substitute List and refusing to hire her for the 2012-2013 Substitute List. Defendants' motion is GRANTED with respect to Plaintiff's claim that Defendants retaliated against her based on her speech while on the CBAC.

SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     July __13__, 2016
           Central Islip, New York